2017 PA Super 403

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br><br>Appellee<br><br>v.<br><br>STEPHEN MACKEY<br><br>Appellant | IN THE SUPERIOR COURT<br>OF<br>PENNSYLVANIA<br><br><br><br><br><br>No. 1460 EDA 2015 |

Appeal from the Judgment of Sentence April 13, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010023-2014

BEFORE:  BOWES, J., MOULTON, J., and STEVENS, P.J.E.*

OPINION BY MOULTON, J.:                    **FILED DECEMBER 20, 2017**

Stephen Mackey appeals from the April 13, 2015 judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his convictions for persons not to possess a firearm, carrying a firearm without a license, and carrying a firearm on the public streets of Philadelphia.[1]  While we acknowledge the significant challenges presented by the facts in this case, we conclude that under controlling precedent the police lacked reasonable suspicion to detain Mackey.  Accordingly, we overturn the trial court's denial of Mackey's motion to suppress and vacate the judgment of sentence.

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

This case involves a recurring scenario – the police receive an anonymous tip that a person matching a particular description in a particular location is carrying a firearm. When such a tip appears to raise a legitimate concern for public safety, the police have a manifest obligation to treat it seriously. As Judge Bowes aptly notes in her concurring opinion, "'[i]t would have been poor police work indeed' for the officers to simply ignore the tip just because possession of a firearm is not *per* se illegal. Conc. Op. at 5 (quoting **Terry v. Ohio**, 392 U.S. 1, 23 (1968). At the same time, in light of the tipster's cloak of anonymity, the police must also account for the possibility that the tip is either in error or, worse, a sham designed to cause trouble for a person who is not carrying a weapon. In responding to such a tip, therefore, as in countless other recurring situations, the police must balance their obligation to protect the public from danger with their constitutional duty to respect the rights of all citizens. Striking that balance is particularly challenging when the safety concern, while significant, is based not on police observations but solely on the unverified allegations of a person who cannot be held to account if those allegations prove false.

The essential facts in this case, developed at a hearing on Mackey's motion to suppress, are largely undisputed. Philadelphia Police Officer Marcus O'Shaughnessy testified that on July 23, 2014, while on routine patrol, he received a radio call for a "person with a gun" aboard the Route 3 SEPTA bus, number 8323, traveling eastbound on Cecil B. Moore Avenue. According to the call, the suspect was described as "a black male wearing a white T-shirt

and a flowered hat." N.T., 2/9/15, at 10. Officer O'Shaughnessy, along with another officer, found, stopped, and boarded the bus within two minutes of receiving the radio call. The trial court described what happened on the bus as follows:

> Officer O'Shaughnessy entered the bus, which was filled with 50 to 60 passengers, and he immediately observed [Mackey] wearing a pink-and-green-flowered hat and a shirt that was white on the back and black on the front.[2] (See N.T. 02/09/15, pp. 5-12, 16-17).
>
> > [2] Officer O'Shaughnessy described the flowered hat as extremely distinctive in that it was a "bucket" hat patterned with pink and green flowers. (See N.T. 02/09/15, p. 17).
>
> Officer O'Shaughnessy testified that he drew his firearm and commanded that [Mackey] show his hands; [Mackey] complied. He described [Mackey] as sitting up straight, while all the other passengers were leaning away and trying to duck for cover. [Mackey] was then handcuffed and led off the bus for passenger as well as officer safety. [Mackey] denied having any weapons; however, as he was being led off the bus, [Mackey] was not walking normally, he was "waddling". Officer O'Shaughnessy observed [Mackey] waddling for 20 to 25 feet. He testified that in his experience as an officer, he believed that [Mackey] was trying to keep a gun from falling out of his loose-fitting pants. Officer O'Shaughnessy then frisked [Mackey] and felt the gun, which he recovered from [Mackey's] waistband. The gun, which was loaded, was secured under property receipt. The entire incident took less than five (5) minutes. (See N.T. 02/09/15, pp. 12-17).

Trial Court Opinion, 12/24/15, at 2-3 ("1925(a) Op.") (some internal citations omitted).

The trial court denied the motion to suppress, concluding that Officer O'Shaughnessy had properly removed Mackey from the bus out of a concern

for public safety and that, based on a combination of the detailed tip, Mackey's response to the officer drawing and pointing his service weapon, and Mackey's "waddling" off the bus, the officer had reasonable suspicion to frisk Mackey for weapons. 1925(a) Op. at 6. Mackey proceeded to a non-jury trial on stipulated facts, after which the trial court convicted him of the offenses listed above. On April 13, 2015, following a pre-sentence investigation, the trial court sentenced Mackey to 2 to 5 years' incarceration, followed by 3 years' probation on the conviction for persons not to possess a firearm. The court imposed no further penalty on the remaining convictions. Mackey filed a timely notice of appeal on May 11, 2015.

Mackey raises the following issues on appeal:

A. Did law enforcement detain . . . Mackey without the required reasonable suspicion?

B. Did law enforcement subject . . . Mackey to a constitutionally infirm frisk?

Mackey's Br. at 2 (full capitalization and suggested answers omitted).

In reviewing the denial of a suppression motion, our role is to determine:

> whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on

an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (internal quotations and citations omitted). Our scope of review is limited to the evidence presented at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1080 (Pa. 2013).

Mackey first alleges that he was illegally detained because Officer O'Shaughnessy lacked reasonable suspicion to believe Mackey was carrying a weapon. According to Mackey, at the moment of detention, Officer O'Shaughnessy lacked reasonable suspicion to seize him because the officer possessed only anonymous radio information that a person partially matching Mackey's appearance was armed, and the officer "did not observe any criminal activity to corroborate the radio call." Mackey's Br. at 5, 10.

The Commonwealth responds that "the totality of the circumstances established reasonable suspicion to believe that criminal activity might be afoot." Cmwlth.'s Br. at 8. The Commonwealth notes that Officer O'Shaughnessy received a detailed tip that described Mackey's appearance, as well as information that he was on a specific bus headed eastbound on Cecil B. Moore Avenue. *Id.* In addition to the tip, the Commonwealth relies on Mackey's "unusual" behavior when Officer O'Shaughnessy drew his service weapon and Mackey's "waddling" off the bus in support of its claim that the officer reasonably believed Mackey was carrying a weapon. *Id.* at 9.

The investigation of possible criminal activity invariably brings police officers in contact with members of the public. Depending on the circumstances, a police-citizen encounter may implicate the liberty and privacy interests of the citizen as embodied in both the federal constitution, *see* U.S. Const. art. IV,[2] and our state constitution, *see* Pa. Const. art. I, § 8.[3] The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a ***Terry** stop*, ***see Terry v. Ohio***, 392 U.S. 1 (1968); and (3) a custodial detention. ***See Commonwealth v. Jones***, 874 A.2d 108, 116 (Pa.Super. 2005).

---

[2] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[3] Our Supreme Court has held that "the Fourth Amendment [of the United States Constitution] and Article I, [Section] 8 [of the Pennsylvania Constitution] are coterminous for ***Terry*** [***v. Ohio***, 392 U.S. 1 (1968)] purposes." ***Commonwealth v. Chase***, 960 A.2d 108, 118 (Pa. 2008). Article I, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

"A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond," *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa.Super. 2000) (internal citations and quotations omitted), and therefore need not be justified by any level of police suspicion. *Commonwealth v. Polo*, 759 A.2d 372, 375 (Pa. 2000).

"In contrast, an 'investigative detention' . . . carries an official compulsion to stop and respond . . . . Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." *DeHart*, 745 A.2d at 636. In addition, while reasonable suspicion of unlawful activity is sufficient to justify a forcible **stop**, it does not necessarily justify a **frisk** for weapons. *See Commonwealth v. Davis*, 102 A.3d 996, 999 (Pa.Super. 2014) ("A *Terry* frisk is a type of investigative detention requiring reasonable suspicion that criminal activity is afoot **and** that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.") (internal quotation marks omitted, emphasis added). Only when the officer reasonably believes the suspect may be armed and dangerous is a weapons frisk appropriate. *See Commonwealth v. Pinney*, 378 A.2d 293, 296 (Pa. 1977) ("[I]n the case of a self-protective search for weapons, a police officer must be able to point to particular facts from which he could reasonably infer that the individual was armed and dangerous.").

Finally, "a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest." *DeHart*, 745 A.2d at 636. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime. *See Commonwealth v. Ellis*, 662 A.2d 1043, 1047 (Pa. 1995) (citing *Dunaway v. New York*, 442 U.S. 200 (1979)).

The parties agree that Mackey's seizure was an investigative detention. Thus, the central issue is whether Officer O'Shaughnessy possessed the necessary "reasonable suspicion" to detain Mackey at the time that detention commenced.[4]

Preliminarily, however, we must determine at what point Mackey was detained.[5] *See Commonwealth v. Riley*, 715 A.2d 1131, 1135 (Pa.Super. 1998) (citing *Terry*, 392 U.S. 1) (noting that reasonable suspicion analysis examines circumstances when stop began). Determining that point with precision is crucial to the constitutional analysis because the police must have reasonable suspicion at the moment of detention; information developed

_____

[4] If the officer had reasonable suspicion for the initial detention, he would also have had reasonable suspicion to frisk Mackey for weapons, given that the tip alleged Mackey possessed a firearm.

[5] The trial court's opinion does not specify the point at which Mackey was detained. And while the parties agree that the interaction between Officer O'Shaughnessy and Mackey at some point became an investigative detention, *see* Mackey's Br. at 6; Cmwlth.'s Br. at 6, they do not agree precisely when that occurred.

**after** a police-citizen encounter moves from consensual to coercive cannot be used to justify the detention. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("[T]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); *Commonwealth v. Wiley*, 858 A.2d 1191, 1197 (Pa.Super. 2004).

An investigative detention "constitutes a seizure of a person and activates the protections of the Fourth Amendment." *Commonwealth v. Lewis*, 636 A.2d 619, 622-23 (Pa. 1994). To determine whether and when a seizure has occurred, we employ "an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave." *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000) (citations omitted). "In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained . . . . In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred." *Id.* at 890.

Officer O'Shaughnessy testified that upon entering the bus, he immediately identified Mackey based on the radio description and then drew his service weapon and pointed it at Mackey while ordering Mackey to show

his hands.[6] N.T. at 14-15. At that moment – when the officer pointed his weapon at Mackey and ordered him to show his hands – Mackey was detained.[7] Under these circumstances, a reasonable person would not feel

---

[6] Officer O'Shaughnessy testified on direct examination as to his actions after boarding the bus:

Q: Officer, what happened when you entered the bus?

A: As soon as I got on the bus, going down the aisles – the entire bus was full. Towards the back of the bus, on the left hand side, right by the back door, I saw [Mackey] who, at the time, was wearing a flowered hat described in the radio call. The radio call said a white T-shirt. [Mackey's] shirt was white on the back, black on the front, similar to the one he's wearing today, if not the same one. As I am walking down the aisle, I draw my gun to make sure that he didn't draw his, if he decided to pull it. This is a crowded bus. I don't want anything to happen.

Q: Okay. Approximately how much time did it take you to reach [Mackey] at the time?

A: Seconds.

Q: Okay. And what happened when you did come into contact with [Mackey]?

A: While walking down the aisle, I had my weapon pointed at him, told him to show me his hands. He placed his hands up. Once I got closer to him, I asked him to put his hands behind his back so that I could handcuff him for safety of the other passengers.

N.T. at 14-15.

[7] In his brief, Mackey also suggests in passing that he was detained even earlier, when Officer O'Shaughnessy stopped the bus on Cecil B. Moore Avenue. Mackey Br. at 8. In light of our conclusion that Mackey was detained when the officer raised his service weapon and ordered Mackey to show his hands, and that the officer lacked reasonable suspicion for that detention, we need not consider this undeveloped argument.

free to leave or otherwise terminate the encounter. ***See United States v. Mendenhall***, 446 U.S. 544, 554 (1980) (listing "examples of circumstances that might indicate a seizure," including "the display of a weapon by an officer . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

The Commonwealth does not appear to disagree that Mackey was detained once the officer ordered him to put his hands in the air. Instead, it recasts the scene on the bus as follows: Officer O'Shaughnessy drew his weapon as soon as he boarded the bus, observed that "everyone on the bus except for [Mackey] ducked [while Mackey] stared straight at the officer," and **then** ordered Mackey to raise his hands. Cmwlth.'s Br. at 8-9. The Commonwealth draws this time line in order to include Mackey's unique response to the drawn service weapon as part of the quantum of evidence that it claims gave Officer O'Shaughnessy the reasonable suspicion needed to justify what it describes as the **subsequent** seizure of Mackey. The chief flaw in this argument is that the Commonwealth's description of the sequence of events on the bus is not supported by the record. While the Commonwealth is entitled to all "reasonable inferences drawn from the facts in light of the officer's experience," ***Commonwealth v. Holmes***, 14 A.3d 89, 95 (Pa. 2011), its assertion here is supported neither by the suppression hearing testimony nor by the trial court's findings of fact. As both Officer Shaughnessy testified and the trial court found, the officer pointed his weapon at Mackey and ordered

him to raise his hands as soon as he located Mackey on the bus. Mackey's unique reaction followed, rather than preceded, the seizure.

Next, we must determine whether Officer O'Shaughnessy had reasonable suspicion to detain Mackey when he drew his service weapon and ordered Mackey to show his hands. An officer may stop and briefly detain a person for investigatory purposes when that officer has "reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot." ***Commonwealth v. Allen***, 725 A.2d 737, 740 (Pa. 1999). "[T]he fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." ***Commonwealth v. Gray***, 784 A.2d 137, 142 (Pa.Super. 2001) (citation omitted). We must consider the totality of the circumstances, including such factors as "tips, the reliability of the informants, time, location, and suspicious activity." ***Id.*** (citing ***Commonwealth v. Freeman***, 757 A.2d 903, 908 (Pa. 2000)). As noted above, however, the relevant "totality" of circumstances does not include events that occurred **after** the seizure was effectuated. For this reason, we may not consider either Mackey's reaction to the drawn gun or his "waddling" off the bus in an apparent attempt to keep a weapon from slipping down his pants. Because both events occurred after the seizure, neither is relevant to the reasonable suspicion analysis.

Where an investigative detention is based on an anonymous tip, "we must determine whether under the totality of the circumstances the

informant's tip established the necessary reasonable suspicion that criminal activity was afoot." ***Commonwealth v. Martin***, 705 A.2d 887, 892 (Pa.Super. 1997) (quoting ***Alabama v. White***, 496 U.S. 325 (1990)). The veracity and reliability of anonymous tips are particularly difficult for the police to evaluate. ***See White***, 496 U.S. at 325. Unlike trusted (or at least tested) informants or members of the public not concealing their identity, anonymous tipsters know they cannot be held to account for false allegations. ***See Florida v. J.L.***, 529 U.S. 266, 270 (2000). In addition, they often fail to reveal the basis for their alleged knowledge and are generally unavailable to answer follow-up questions from police. ***See White***, 496 U.S. at 329 (citing ***Illinois v. Gates***, 462 U.S. 213, 237 (1983)).

The United States Supreme Court has made clear that an anonymous tip that a particular person in a particular location is carrying a firearm does not, by itself, establish reasonable suspicion for an investigative detention. ***J.L.***, 529 U.S. at 274. In ***J.L.***, police received an anonymous tip that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." ***Id.*** at 268. Two officers responded to the call and, about six minutes later, arrived at the bus stop to find three black males. ***Id.*** One of the males, J.L., was wearing a plaid shirt. ***Id.*** "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct." ***Id.*** Acting solely on the anonymous tip and matching description, officers ordered J.L. to "put his hands on the bus stop, frisked him, and seized a gun from J.L.'s pocket." ***Id.***

Recognizing that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," the **J.L.** Court analyzed whether the tip contained "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." **Id.** at 270 (quoting **White**, 496 U.S. at 327, 329). The Court unanimously held that the officers lacked reasonable suspicion based on the anonymous tip:

> The tip in the instant case lacked the moderate indicia of reliability present in **White**[8] and essential to the Court's decision in that case. The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L. If **White** was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

**Id.** at 271.

_____

[8] In **White**, the anonymous tipster provided police information about the appellant's appearance, her vehicle, her starting location and destination, the time appellant would leave, and the route the appellant would take. 496 U.S. at 327, 331. The United States Supreme Court held that, while the facts presented a "close case," the information provided indicia of reliability because "only a small number of people are generally privy to a person's itinerary." **Id.** at 332. However, the **White** Court emphasized that the "reliability of the informer's allegations" was the result of "independent corroboration by the police of significant aspects of the informer's predictions." **Id.**

Three years prior to *J.L.*, the Pennsylvania Supreme Court reached the same conclusion announced by the *J.L.* Court — police lack reasonable suspicion where an anonymous tip merely provides a description and the location of a person who the tipster claims is armed. *See Commonwealth v. Jackson*, 698 A.2d 571 (Pa. 1997). In *Jackson*, an officer received a radio report "of a man in green jacket carrying a gun" in a specific location. *Jackson*, 698 A.2d at 572. The officer responded within two minutes, finding Jackson, who was wearing a green jacket, amongst a group of people. *Id.* The officer immediately frisked Jackson and did not find a gun, but did find a small key box that contained packets of cocaine. *Id.*

The *Jackson* Court concluded that the officer lacked reasonable suspicion to stop and frisk Jackson, noting that "[w]hen . . . the underlying source of the police department's information is an anonymous telephone call, . . . the tip should be treated with particular suspicion." *Id.* at 575. The Court adopted the following reasoning from its earlier plurality opinion in *Commonwealth v. Hawkins*, 692 A.2d 1068 (Pa. 1997):

> The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before. And since there is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite suspicion.

*Id.* (quoting *Hawkins*, 692 A.2d at 1070). Thus, "the police must establish that they have a reasonable suspicion that the individual is involved in, or about to commit a crime. If the tip contains sufficient information, the police

- 15 -

can do this by corroborating sufficient details of the tip. Otherwise, the police must investigate further by means not constituting a search and seizure." ***Id.***

Our decision today is controlled by the decision of the United States Supreme Court in ***J.L.***, as well as by our Supreme Court's decision in ***Jackson***. The facts in ***J.L.*** and this case are nearly indistinguishable — the only difference being that Mackey was traveling on a bus whereas the suspect in ***J.L.*** was standing at a bus stop. Like the officers in ***J.L.***, Officer O'Shaughnessy stopped Mackey within minutes of receiving the radio call, based on the matching appearance and location. Like the officers in ***J.L.***, Officer O'Shaughnessy seized his suspect on arrival, without developing any support for the tipster's assertion that the suspect was armed. Further, both anonymous tips reported only that the person in question was armed — there was no suggestion that either suspect was carrying a firearm without a license or was otherwise involved in or about to commit a crime. ***See*** 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), 6108. Indeed, in neither case did the officers on the scene observe any signs of distress from others in the vicinity. In sum, in this case as in ***J.L.***, "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the suspect.]" ***J.L.***, 529 U.S. at 271. Absent any independent information to corroborate the anonymous tip, we conclude that Officer O'Shaughnessy lacked reasonable suspicion to seize Mackey and, therefore, the gun recovered should have been suppressed as the fruit of an illegal seizure.

In its opinion, the trial court relied heavily on the officer's confirmation of Mackey's precise location and distinctive flowered hat as corroboration for the anonymous tip. 1925(a) Op. at 6. This conclusion, however, is directly contrary to the decision in *J.L*. Like the tip in *J.L.*, the anonymous tip here only described Mackey's appearance and current location — it provided no predictions of **future** behavior of any kind that police officers could have corroborated through observation, let alone any allegations of future criminal activity. *See White*, 496 U.S. at 332 (noting that a "caller's ability to predict . . . *future behavior* . . . demonstrate[s] inside information [and] a special familiarity with [appellant's] affairs . . . . [I]t is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.") (emphasis in original). As in *J.L.*, the information provided did not include any indicia of reliability in the tip — the only details police could corroborate were Mackey's location and his appearance. *See J.L.*, 529 U.S. at 271; *see also Jackson*, 698 A.2d at 574 ("[T]he only detail that the police were able to corroborate in this case was the fact that appellant was at the location described, and that he was wearing a green jacket."). Officer O'Shaughnessy could not have known "whether the information [from the radio call] was reliable . . . . [or merely] a prank call." *Hawkins*, 692 A.2d at 1070. Thus, in order to lawfully seize Mackey, Officer O'Shaughnessy needed to corroborate the anonymous tip through further observation.

Despite the lack of independent corroboration, the trial court concluded that the totality of the circumstances provided Officer O'Shaughnessy with reasonable suspicion that Mackey was armed. 1925(a) Op. at 6. The court found reasonable suspicion based on the combination of the anonymous tip, Mackey's "unusual" behavior, his "waddling" off the bus, and his travel through a high-crime area.[9] *Id.* We disagree.

As noted above, the relevant inquiry is whether an officer possesses reasonable suspicion of criminal activity **before** initiating the detention. *J.L.*, 529 U.S. at 271; *Riley*, 715 A.2d at 1135. While experience teaches that the reality of these encounters often does not yield sharp constitutional lines, the prescribed constitutional analysis demands that at the moment an encounter moves from a consensual "mere encounter" to an investigative detention, police must already have the requisite reasonable suspicion to support that detention – reasonable suspicion cannot be based on information discovered after the detention has begun. *J.L.*, 529 U.S. at 271; *see also Wiley*, 858 A.2d at 1197 (holding that anonymous tipster's post-detention revelation of

---

[9] In its opinion, the trial court noted that:

> Officer O'Shaughnessy testified that in his seven years' experience as a police officer, he had made many arrests for violent crimes, including 25 for guns, and that 75 percent of arrests made in the area of 20th and Cecil B. Moore were for crimes of violence, and thus it is known as a high violent crime area. (See N.T. 02/09/15, pp. 7-9).

1925(a) Op. at 2 n.1.

identity to police could not be considered in reasonable suspicion analysis). A trial court must identify this moment to frame its analysis of the constitutionality of police conduct. Here, the officer's observations after the detention began, such as Mackey's behavior in response to having a weapon pointed at him[10] and his "waddling" when exiting the bus, cannot establish that reasonable suspicion existed at the earlier moment of seizure. Officer O'Shaughnessy needed reasonable suspicion that Mackey was committing a crime **before** initiating the detention, which the anonymous tip alone failed to provide.[11]

_____

[10] In its brief, the Commonwealth relies heavily on the fact that Mackey responded differently than did the other passengers when Officer O'Shaughnessy drew his weapon. **See** Cmwlth.'s Br. at 8-9. However, as discussed above, we cannot consider Mackey's reaction in the reasonable suspicion analysis because that occurred after the detention began – Mackey was clearly seized at the moment Officer O'Shaughnessy pointed his weapon at Mackey. **Cf. In re D.M.**, 781 A.2d 1161, 1164 (holding that requisite cause is measured "at the time [police] initially approach[] the [suspect]" and suspect's flight **after** seizure cannot be used in reasonable suspicion calculus). Indeed, Mackey's distinctive reaction might well have been based on the fact he, and not the other passengers, was being seized by the police.

[11] It bears noting, as the United States Supreme Court did in **J.L.**, that the fact "[t]hat the allegation about the gun turned out to be correct does not suggest that the officer[], prior to the frisk[], had a reasonable basis for suspecting [the subject] of engaging in unlawful conduct." **J.L.**, 529 U.S. at 271. Courts reviewing motions to suppress must guard against the hindsight bias occasioned by the fact that in each such case, the police turned out to be right – the suspect did indeed possess the item (or other evidence of crime) for which the police were searching. The set of circumstances for which our constitutional protections may be more easily understood as valuable – when the police turn out to be wrong in their suspicion that a particular person is engaged in wrongdoing – most often do not result in litigation.

Further, while we recognize that a combination of facts may establish reasonable suspicion, *see Commonwealth v. Cook*, 735 A.2d 673, 677 (Pa. 1999) (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)), and a suspect's location in a high-crime area may be a factor supporting an officer's reasonable suspicion that criminal activity is afoot, Mackey's travel through a high-crime area on a bus does not change our analysis. This fact did not corroborate the information in the anonymous tip and provided no information from which Officer O'Shaughnessy could determine whether Mackey was carrying a firearm, was committing a crime, or was about to commit a crime. *See Commonwealth v. Ayala*, 791 A.2d 1202, 1210 (Pa.Super. 2002) ("Our caselaw is quite emphatic that an individual's mere presence in a high crime area is manifestly insufficient to justify a *Terry* stop.").

The Commonwealth's final argument in support of affirmance centers on an understandable concern for public safety. In particular, the Commonwealth argues that Officer O'Shaughnessy's actions were reasonable; it attempts to distinguish *J.L.* by citing safety concerns, noting that officers had a "report [that] described a man with a gun on a crowded public bus, an enclosed area where every passenger was at risk." Cmwlth.'s Br. at 9. While these public safety concerns are palpable, we disagree that they render the officer's actions constitutional, as the United States Supreme Court rejected similar arguments in *J.L.*

There, the State of Florida, and the United States as *amicus curiae*, advanced two related arguments. First, they argued that the Court should

- 20 -

create a *per se* rule finding reasonable suspicion where "(1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip." ***J.L.***, 529 U.S. at 271. Second, they argued that even where a tip is later to found to lack sufficient indicia of reliability, the Court should recognize a public-safety-based "firearm exception" to ***Terry*** and categorically allow a stop and frisk where a tip alleges that a person is carrying an illegal firearm. ***Id.*** at 272.

The ***J.L.*** Court rejected both of these arguments. With respect to the *per se* rule, the Court concluded that an anonymous tip, in the context of reasonable suspicion, requires not only an accurate description that allows for identification but also information that shows "the tipster has knowledge of concealed criminal activity." ***Id.*** In response to the request that it recognize some form of "firearm exception" to ***Terry***, the Court declined, reasoning as follows:

> Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry*'s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. **But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing**

> **an anonymous call falsely reporting the target's unlawful carriage of a gun.** Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it *per se* foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. If police officers may properly conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in *Adams* and *White*, the Fourth Amendment is not so easily satisfied.

Id. at 272-273 (internal citations omitted, emphasis added); ***see also***

***Jackson***, 698 A.2d at 575 (declining to create a "firearms exception" to ***Terry***

under Pennsylvania law because the Pennsylvania Supreme Court "is not

empowered . . . to overrule ***Terry*** in favor of a lower standard of protection

under the state and federal constitutions").[12]

_____

[12] The dissent does not mention, let alone attempt to distinguish, the Supreme Court's decision in ***J.L.*** Instead, it castigates the opinion announcing the judgment in ***Commonwealth v. Hawkins***, 692 A.2d 1068 (Pa. 1997) for failing to take seriously "the Commonwealth's references to schoolyard shootings and assassination of public figures as possible consequences if ***Terry*** jurisprudence always required independent corroboration of 'man with gun' anonymous tips," Dissenting Op. at 1-2. Whatever the relevance of dicta in a non-binding opinion to the future development of the law in this area, this Court remains bound by the decisions of the United States Supreme Court.

While the **J.L.** Court rejected a categorical "firearms exception," the Court did not foreclose the possibility that certain types of public-safety concerns[13] could excuse the reliability requirement:

> The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear **the indicia of reliability we demand for a report of a person carrying a firearm** before the police can constitutionally conduct a frisk.

**J.L.**, 529 U.S. at 273-74 (emphasis added); **see also City of Indianapolis v. Edmond**, 531 U.S. 32, 44 (2000) (noting that, with respect to "circumstances that may justify a law enforcement checkpoint . . . the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack"). While the Commonwealth correctly points out that the confined space of a bus presented the officer in this case with a somewhat different and potentially more acute set of safety

---

[13] The trial court's decision was based in part on its belief that Officer O'Shaughnessy's decision to order Mackey off the bus was the officer's only reasonable alternative in light of the risk to public safety. 1925(a) Op. at 6 ("Given the tight, crowded quarters and obvious concern for public safety, the officer reasonably removed [Mackey] from the bus."). We acknowledge that the result in this case, compelled by controlling authority from both the United States Supreme Court and our Supreme Court, begs an important question: What should a police officer do when confronted with the sort of anonymous tip at issue here? The answer, also compelled by controlling authority, is to conduct the additional investigation necessary to corroborate (or discount) the tip's allegation. **See Jackson**, 698 A.2d at 575 ("police must investigate further by means not constituting a search and seizure").

concerns than did the bus stop in *J.L.*, that difference appears to be one of degree rather than kind.[14]  In any event, we decline to create an exception to the well-established reliability requirement on these facts.[15]

Judgment of sentence reversed.

Judge Bowes joins this Opinion and files a Concurring Opinion.

President Judge Emeritus Stevens files a Dissenting Opinion.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/20/2017

_____

[14] Here, as in *J.L.*, the anonymous caller did not report that Mackey had brandished the weapon, threatened its use, or even told another person that he was carrying a concealed firearm.  As the concurring opinion notes, and "[a]s illustrated by the petition for allowance of appeal in [*Commonwealth v.*] *Hicks*, [2017 WL 4351309 (Pa. 2017) (granting petition for allowance of appeal)], the dangers posed by the mere presence of a firearm with respect to Fourth Amendment analysis is a matter of dispute."  Conc. Op. at 7. Nonetheless, given the close factual similarity of this case to *J.L.*, and the fact that the *J.L.* Court rejected public safety arguments almost identical to those presented here, we are constrained to reverse.  *See also id.* at 10.

[15] Mackey also argues that Officer O'Shaughnessy illegally frisked him. Mackey's Br. at 10.  While we agree with the Commonwealth that Mackey waived this argument by failing to raise it before the suppression court, *see Commonwealth v. Collazo*, 654 A.2d 1174, 1176 (Pa.Super. 1995), because we have already determined that Officer O'Shaughnessy did not have reasonable suspicion to seize Mackey, we need not address this issue.