J-A17009-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                 :            PENNSYLVANIA

         Appellant       :

         v.              :

BRITNEY MONIQUE KENNEY     :     No. 641 WDA 2024

Appeal from the Suppression Order Entered May 6, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0002874-2023

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                 :            PENNSYLVANIA

         Appellant       :

         v.              :

TYREK GERMANY             :     No. 642 WDA 2024

Appeal from the Suppression Order Entered May 6, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0002873-2023

BEFORE: McLAUGHLIN, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:         **FILED: October 1, 2025**

The Commonwealth appeals from the order granting Britney Kenney and

Tyrek Germany's motion to suppress. We affirm.

The trial court summarized the testimony at the suppression hearing as

follows:

> [O]n July 12, 2022, law enforcement officers from the
> Monroeville Police Department and eventually the
> Pennsylvania Attorney General's Office encountered Mr.

Germany and Ms. Kenney at the Rodeway Inn hotel (the "Hotel") in Monroeville, Pennsylvania. The Hotel was known to law enforcement as a location where criminal activity occurred . . .

Mr. Germany was observed at approximately 3:00 p.m. exiting the Hotel's lobby; walking from the lobby to a silver SUV in the Hotel's parking lot; interacting with the occupant of that vehicle (who was later identified as Ms. Kenney); and then entering a blue SUV, also in the Hotel's parking lot, which he drove to another location in the parking lot. Ms. Kenney moved the silver SUV too and parked it in an area of the parking lot different than the area in which Mr. Germany parked. Mr. Germany and Ms. Kenney eventually entered Room 215. Law enforcement observed Mr. Germany enter and exit Room 215 on multiple occasions. At one time, he brought two bags (one white and one blue) into Room 215. On another occasion, he entered Room 215 with what appeared to be a large nondescript bulge in the pocket of his pants. After approximately 45 minutes, Mr. Germany departed from the Hotel in the blue SUV. . . .

After Mr. Germany departed the Hotel, law enforcement determined that he had a prior criminal history involving narcotics as well as fleeing/eluding the police. They also learned that Mr. Germany's driver[']s license was suspended. Law enforcement found that Ms. Kenney had no prior criminal history. They further observed that a pizza was delivered to Ms. Kenney in Room 215 after Mr. Germany left the Hotel.

Driving the blue SUV, Mr. Germany returned to the Hotel at approximately 9:55 p.m. After he parked and exited the vehicle, Mr. Germany proceeded to a stairwell that led to Room 215, which was on the Hotel's second floor. At that time, law enforcement confronted Mr. Germany.

Before the completion of Mr. Germany's interaction with law enforcement, two law enforcement officers - Agent [Joseph] Barna and Detective [Steve] Moritz - proceeded to Room 215 . . . Agent Barna ultimately knocked on Room 215's door, which had a "do not disturb" sign on it.

Rule 1925(a) Opinion, filed in Kenney's docket on 9/11/24, at 2-4 (citations omitted).

Agent Barna testified at the suppression hearing that the following then occurred:

> [THE COMMONWEALTH]. Okay. So, you approach Room 215?
>
> [AGENT BARNA]. Correct.
>
> Q. And is anyone with you?
>
> A. Myself and Detective Moritz.
>
> Q. Okay. And what happened, you knock I'm assuming?
>
> A. That's correct, myself and Detective Moritz. Five or ten seconds later the door opens and immediately a large cloud of smoke, marijuana, overwhelming smoke of marijuana coming from the room. We identified ourselves, stated about the vehicle and then in that conversation I asked if she had a medical marijuana card. At this point in my mind we were going to be getting a search warrant no matter what for the room for weed but then the door was opened totally and then we saw the packaging and stuff on the table.
>
> Q. Let me stop you there. Who opened the door?
>
> A. She opened the door.
>
> Q. Who is she?
>
> A. Miss Kenney.
>
> Q. Okay, the co-defendant?
>
> A. Yes.
>
> Q. And when she opened the door a plume of smoke exited the room?
>
> A. A large amount, it was full of smoke, yes.

Q. You testified you asked her if she had a medical marijuana card. What was her answer?

A. She did not . . .

Q. You testified that as you're talking to her about the medical marijuana card the door to the room is opened?

A. Correct.

Q. And what did you observe through the open door?

A. There was a table directly in from the door with a large bag of fentanyl, a pile of fentanyl, a card and then empty and filled stamp bags.

Q. You're able to see it from --

A. From the threshold, correct.

Q. Threshold of the door okay. How did you know it was suspected fentanyl, correct?

A. I believe the lab came back and it was fentanyl but suspected at that time, correct.

Q. At that time, okay. And how did you know what you were looking at?

A. Through my training and experience, probably been a part of thousands of drug investigations. It's all I do every day. So --

Q. What do you do at that point after you're able to observe this through the threshold?

A. Detective Moritz radios to [Patrolman] Lou [Cuccaro] to go ahead and arrest Mr. Germany. Miss Kenney was detained at that point and placed under arrest. We cleared the hotel room to make sure there was no other persons there and then we waited for a search warrant.

N.T. Suppression Hearing, 2/29/24, at 103-05.

On cross-examination, Agent Barna stated that after he and Detective Moritz knocked on the door of Room 215 and announced who they were,

Kenney opened the door "a substantial amount" (two to three feet) and she did not open the door just "a crack." *Id.* at 134. He testified that when Kenney initially opened the door, he could not see the narcotics on the table in the room. *Id.* at 134-35. Rather, he saw an "overwhelming" plume of smoke and could smell the odor of marijuana. *Id.* at 135. Agent Barna stated that he then questioned Kenney if she had a medical marijuana card. *Id.* Detective Barna stated that, at some point while speaking to Kenney in the doorway about a medical marijuana card, the door opened fully, and he was able to view the narcotics in the room. *Id.* at 135-36. He could not recall whether it was he, Detective Moritz, or Kenney who fully opened the door. *Id.* at 136-37.

Kenney testified at the suppression hearing as follows:

> [DEFENSE COUNSEL]. And how many officers came to the door?
>
> [KENNEY]. Two.
>
> Q. Did you open the door?
>
> A. It was cracked.
>
> Q. When you say it was cracked how far would you say that was opened?
>
> A. Enough for me to look out and see who was on the other side.
>
> Q. Did one of the officers place their foot in the door?
>
> A. Yes.
>
> Q. Which officer was that?
>
> A. Officer Barna.
>
> Q. And did he place his foot there immediately when you opened the door?

A. Yes.

Q. Did this prevent you from closing the door?

A. Yes.

Q. So at this point did you feel free to shut the door and refuse their questions?

A. No.

Q. While you're talking to them, do the officers -- do detectives ever ask you if you had a medical marijuana card?

A. No.

Q. Do they mention to you that they smelled marijuana?

A. Yes.

Q. During this interaction how does the door go from being cracked open to fully opened?

A. Mr. Barna pushes the door open.

Q. How does he push it open?

A. Kind of like shoulder and arm with his foot or just putting his weight towards it.

Q. That's where it opens to where you can see the table?

A. Right.

*Id.* at 169-70. Kenney admitted that she was smoking marijuana in Room 215. *Id.* at 171.

After the search warrant was executed, a large amount of heroin, fentanyl, packaging materials, and blue and white bags were recovered from Room 215. The Commonwealth charged Kenney and Germany via criminal informations with possession with intent to deliver, possession of a controlled substance, possession or distribution of small amount of marijuana,

possession of drug paraphernalia, and receiving stolen property. The informations also joined Kenney and Germany's cases pursuant to Pa.R.Crim.P. 582. Both Kenney and Germany filed motions to suppress the evidence found in the hotel room. After a suppression hearing, the court granted the motions and entered an order stating that "all evidence obtained as result of the search of the hotel room is hereby suppressed." Order, 5/6/24. The Commonwealth filed a motion for reconsideration. Before the court ruled on the motion for reconsideration, the Commonwealth filed the present appeal.

The Commonwealth raises the following issues:

I. Did the trial court err in granting defendants' motions to suppress when it ruled that the officers exceeded their legal authority in opening the door to a hotel room during a "knock and talk" where the totality of the circumstances established a reasonable suspicion that the defendant was engaged in illegal drug use inside the room?

II. Is the Commonwealth's appeal of the suppression of the evidence recovered from the hotel room effective against both defendant Kenney and defendant Germany?

Commonwealth's Br. at 4.[1]

_____

[1] The Commonwealth's notice of appeal in Germany's case stated it was from "the order suppressing evidence entered in this matter on the 6th day of May, 2024 . . . as evidenced by the attached docket and order." The order that the Commonwealth attached was the written order suppressing Germany's statements to police. Two weeks after filing the notice of appeal, the Commonwealth moved in this Court to amend the notice of appeal to append a copy of the oral order the trial court issued from the bench suppressing the
*(Footnote Continued Next Page)*

On appeal from an order granting a motion to suppress, our review is "limited to determining whether the record supported th[e] court's factual findings and whether the legal conclusions that the suppression court drew from those facts were correct." **Commonwealth v. Torres**, 764 A.2d 532, 536-37 (Pa. 2001). We consider "only the evidence presented by the defense and so much of the evidence for the prosecution which remained uncontradicted when read in the context of the record as a whole." **Id.** at 537.

This Court is "highly deferential to the suppression court's factual findings and credibility determination[s]." **Commonwealth v. Carmenates**, 266 A.3d 1117, 1123 (Pa.Super. 2021) (*en banc*). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." **Id.** (citation omitted). If there is support in the record for the suppression court's findings, we may not substitute our own findings. **Commonwealth v. Batista**, 219 A.3d 1199, 1206 (Pa.Super. 2019). However, we review the suppression court's legal conclusions *de novo*. **Id.**

---

evidence found in the hotel room. Both the written order and the oral order were entered the same day. On August 5, 2024, this Court denied the Commonwealth's motion to amend without prejudice to the Commonwealth's ability to raise the issue before the merits panel. Germany agrees with the Commonwealth that its appeal against him is proper. **See** Germany's Br. at 27. The Commonwealth's attaching the wrong order to the notice of appeal did not render its timely appeal ineffective. **See** Pa.R.A.P. 902. The appeal is properly before us.

The Commonwealth argues that the evidence found in the hotel room should not have been suppressed because the plain view exception applied here. Commonwealth's Br. at 22. It notes that Pennsylvania recognizes three categories of encounters between citizens and police: (1) a mere encounter, (2) an investigative detention, and (3) a custodial detention.[2] *Id.* at 23. The Commonwealth asserts that "the officers' investigation began as a mere encounter when they knocked on the door to Room 215 and then blossomed into a lawful investigative detention once the officers developed probable cause — much less reasonable suspicion — that Kenney was illegally smoking marijuana within Room 215." *Id.* at 24. It points out that the officers' initial interaction with Kenney was a "knock and talk" and this knock and talk "was a mere encounter that lawfully permitted officers to be present at the threshold of Room 215 without any level of suspicion." *Id.* at 26-27. The

_____

[2] There are "three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, . . . ; and (3) a custodial detention." ***Commonwealth v. Dix***, 207 A.3d 383, 388 (Pa.Super. 2019) (quoting ***Commonwealth v. Mackey***, 177 A.3d 221, 227 (Pa.Super. 2017) (footnote omitted)). "A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen." ***Mackey***, 177 A.3d at 227 (citation omitted). Such an encounter "carries no official compulsion to stop or respond" and does not need to "be justified by any level of police suspicion." ***Id.*** (citation omitted). In contrast, a custodial detention requires probable cause "to believe that the person so detained has committed or is committing a crime." ***Id.*** An investigative detention "has elements of official compulsion" and therefore "requires reasonable suspicion of unlawful activity." ***Id.*** (citation omitted). An investigative detention "subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest." ***Commonwealth v. Morrison***, 166 A.3d 357, 364 (Pa.Super. 2017) (citation omitted).

Commonwealth notes that although Kenney was under no obligation to speak or open the door, she voluntarily opened the door after the officers knocked. *Id.* at 27-28. It emphasizes that "the officers simply did not need to possess *any* level of reasonable suspicion to first knock on Kenney's door" because it was a mere encounter and thus, "[t]he trial court's admonishment that the officers had not observed any outwardly illegal activity before knocking on the door of Room 215 was error." *Id.* at 28-29 (emphasis in original).

The Commonwealth maintains that once Kenney voluntarily opened the door and the officers smelled marijuana and observed a plume of smoke, they had probable cause to believe Kenney was illegally smoking marijuana. *Id.* at 29. In the Commonwealth's view, at that point, the mere encounter progressed into an investigative detention that lawfully permitted the officers to open the door. *Id.* The Commonwealth highlights that "the record reflects that after Kenney voluntarily opened the door to Room 215 — but before Agent Barna stuck his foot in the door — the officers immediately observed a large cloud [and] overwhelming smoke of marijuana coming from the room" and "[i]t was only then that Agent Barna stuck his foot in the door." *Id.* at 30-31 (internal citation marks omitted, emphasis removed). According to the Commonwealth, "the officers were within their legal authority to fully open the cracked door in order to conduct this investigative detention, and were thus at a lawful vantage point when they made a plain view of the narcotics." *Id.* at 24.

The Commonwealth further argues that the trial court erroneously applied a subjective legal standard in determining whether the officers had the legal authority to open the door to Room 215. *Id.* at 32. It points out that reasonable suspicion is based on an objective standard, not subjective intent. *Id.* at 33. In its view, "[t]he trial court incorrectly focused on Agent Barna's subjective intention not to detain Kenney for the marijuana smoke in contradiction of well-settled law requiring the court to make an objective determination of reasonable suspicion." *Id.* at 33-34 (emphasis removed). The Commonwealth argues "[h]ad the trial court conducted this objective analysis, it would have been clear that a reasonable officer would have had reasonable suspicion that a violation of the [Medical Marijauna Act] was underway as soon as the cloud of marijuana smoke emanated from Room 215, such that the officer could lawfully open the door in order to conduct an investigative detention of Kenney." *Id.* at 34-35. The Commonwealth urges this Court to find that the officers' plain view of the narcotics was part of a lawful investigative detention and reverse the trial court's order to suppress. *Id.* at 35.

The Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution protect against unreasonable searches and seizures. "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000). "A hotel room can clearly be the object of Fourth Amendment

protection as much as a home or an office." **Commonwealth v. Dean**, 940 A.2d 514, 519 (Pa.Super. 2008) (citation omitted).

"The plain view doctrine provides that evidence in plain view of the police can be seized without a warrant[.]" **Commonwealth v. Luczki**, 212 A.3d 530, 546 (Pa.Super. 2019) (citation omitted). However, "inherent in the plain view doctrine is the principle the seized object must not have been put in plain view as a result of unlawful police conduct." **Commonwealth v. Heidelberg**, 267 A.3d 492, 504 (Pa.Super. 2021) (*en banc*) (citation omitted); **see also Texas v. Brown**, 460 U.S. 730, 737 (1983) (stating the "question whether property in plain view of the police may be seized [ ] must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question."). Indeed, under the plain view doctrine, a warrantless seizure of an item is only permissible when: "(1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object." **Heidelberg**, 267 A.3d at 504 (citation omitted).

Further,

> our case law contemplates two scenarios in which an item observed in plain view may be seized by law enforcement officers. The first scenario arises when the officers' "view" of contraband or some illegal object occurs *after* they have first entered a constitutionally protected space and the intrusion was justified by consent, hot pursuit or a warrant. Because the constitutional imperative of probable cause has been satisfied before an impartial magistrate or a clear exception has been shown, officers on the scene may seize

the item they observed without further recourse to the warrant process.

The second scenario arises when the officers' view occurs *before* they have physically entered the constitutionally protected area. Because the defendant's right to be free of unreasonable search and seizure has not yet been breached or evaluated by a magistrate, the warrant procedure must be carried out or the police must demonstrate the lawful exceptions of exigent circumstances or voluntary consent.

*Commonwealth v. Newton*, 943 A.2d 278, 282 (Pa.Super. 2007) (internal citations omitted, emphasis in original).

Here, the court found that the plain view exception to the warrant requirement did not apply and thus, law enforcement did not have the lawful right of access to the contraband observed in Room 215. It explained:

[T]he credible evidence from the [suppression h]earing established that when Agent Barna knocked on Room 215's door, Ms. Kenney opened it only a crack. At that time, Agent Barna could not see the contraband in Room 215. He did, however, place his foot in the doorway, preventing Ms. Kenney from shutting the door. Moreover, he subsequently pushed the door to Room 215 open – without Ms. Kenney's permission – and at that time observed the contraband within the room. Accordingly, regardless of whether Agent Barna and Detective Moritz had the legal authority to knock on the door of Room 215 and have a discussion with Ms. Kenney, they exceeded any legal authority they had when Agent Barna – without the intention to detain Ms. Kenney or to obtain a warrant . . . prevented Ms. Kenney from closing the door and instead further forced the door open, revealing the contraband inside the room.

Rule 1925(a) Op. at 12.

This Court addressed a similar factual situation in *Commonwealth v. Martin*, 253 A.3d 1225 (Pa.Super. 2021). There, officers were called to a hotel room after a report of an odor of marijuana smoke. *Id.* at 1226. Upon their

arrival, Officer Jason Moss immediately detected the odor of marijuana smoke emanating from the room and knocked on the door. *Id.* He did not announce his identity as a police officer but was in police uniform. *Id.* A woman opened the door, allowing Officer Moss to peer inside, which is when he first observed the appellant in the room. *Id.* at 1227. He saw the appellant immediately reach over a chair and the officer feared that the appellant was reaching for a weapon. *Id.* Officer Moss drew his firearm and ordered the appellant to put his hands on his head; the appellant complied and sat down on a chair. *Id.* Officer Moss subsequently entered the room and conducted a pat-down search of the appellant. *Id.* He discovered a firearm on the appellant's person and arrested him. *Id.*

The question before this Court was "whether Officer Moss observed [the a]ppellant's ostensibly furtive movements from a lawful vantage point." *Id.* at 1228. We noted that "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do." *Id.* at 1229 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). We opined that "[i]f Officer Moss was completely outside of the hotel room when he observed [the a]ppellant's seemingly furtive behavior, he made those observations from a lawful vantage point for Fourth Amendment purposes." *Id.* However, we noted that Officer Moss admitted on cross-examination that he was at least partially across the threshold when he observed the appellant reaching over the chair. *Id.* at 1230. We explained:

The record here establishes that Officer Moss had entered the room by crossing the threshold of the door with half of his body when he observed [the a]ppellant's furtive movements. This entry occurred without Officer Moss's having first obtained a warrant, and without the consent of either [the a]ppellant or the woman who had answered the door. As such, the officer did not make the observation that gave rise to a concern for his safety from a lawful vantage point. Accordingly, we conclude that the trial court erred when it denied [the a]ppellant's suppression motion premised upon the unsupported factual conclusion that Officer Moss had not yet entered the room when he observed [the a]ppellant's reaching over the chair.

*Id.* at 1231 (quotation marks omitted).

Here, Agent Barna testified that he could not remember who – he, Kenney, or Detective Moritz – fully opened the door to the hotel room. Conversely, Kenney testified that she "cracked" open the door and Agent Barna immediately put his foot in the door and prevented her from closing it. The trial court weighed the credibility of the witnesses and determined that Agent Barna unlawfully entered the threshold of the door without a warrant and without exigent circumstances. The trial court's findings of facts are supported by the record, and this Court cannot reweigh the evidence and substitute its findings for those of the trial court. *Batista*, 219 A.3d at 1206. Since there was evidence that Agent Barno first observed the narcotics in the room *after* he crossed the threshold, he was not in a lawful vantage point at the time he observed the narcotics and thus, the plain view doctrine is inapplicable. Accordingly, the search was unlawful, and the court properly granted the motion to suppress.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 10/01/2025