J-S29030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
RAMIR RAISON :
:
Appellant : No. 3399 EDA 2019

Appeal from the Judgment of Sentence Entered November 7, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003545-2018

BEFORE:   PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY NICHOLS, J.:                **FILED AUGUST 9, 2021**

Appellant Ramir Raison appeals from the judgment of sentence imposed following his convictions for resisting arrest and multiple violations of the Uniform Firearms Act (VUFA).  Appellant argues that the trial court erred in denying his motion to suppress.  Following our review of the record, we are constrained to vacate the judgment of sentence, reverse the trial court's suppression order, and remand for further proceedings.

On April 21, 2018, Southeastern Pennsylvania Transportation Authority (SEPTA) Police Officer Clark Shields arrested Appellant at the Frankford Transportation Center (FTC) in Philadelphia after the officer received reports of a man attempting to sell guns at a pawnshop.  Appellant was charged with resisting arrest, recklessly endangering another person (REAP), and three

_____

[*] Retired Senior Judge assigned to the Superior Court.

counts each of possession of a firearm by a prohibited person, firearms not to be carried without a license, and carrying a firearm on a public street.[1]

Appellant filed a suppression motion in which he argued, among other things, that the police did not have reasonable suspicion to seize him based on the information that Appellant had firearms in his possession. **See** N.T. Suppression Hr'g, 9/5/19, at 6. At the suppression hearing, the Commonwealth introduced surveillance footage of the encounter between Officer Shields and Appellant. **See id.** at 14; Commonwealth's Ex. 3.

We summarize the evidence presented at the suppression hearing as follows.[2] Officer Shields testified that at approximately 11:00 a.m. on April 21, 2018, he was on duty at the FTC. N.T. Suppression Hr'g at 8. Officer Shields described the neighborhood surrounding the FTC as a "high-crime, high-drug area." **Id.** at 13.

Officer Shields stated that he "got a radio call that there was a male inside of a pawnshop across the street trying to sell guns. I think they said three guns and they gave a description of the male. It was a black male with a jean jacket, red hoodie, and a duffel bag." **Id.** at 8. Officer Shields also testified that the Philadelphia Police Department also sent an email to SEPTA

---

[1] 18 Pa.C.S. §§ 5104, 2705, 6105, 6106, and 6108, respectively.

[2] In reviewing a trial court's suppression ruling, we may consider only the evidence presented at the suppression hearing. **In re L.J.**, 79 A.3d 1073, 1085–1087 (Pa. 2013).

officers that included a description and a photo of the suspect.[3],[4]  *Id.* at 11,

20; *see* Commonwealth's Ex. 1.

Shortly thereafter, Officer Shields received an alert that a man matching

the police department's description was inside the FTC near the main terminal.

*Id.* at 9.  Officer Shields took the escalator down towards the main terminal,

where he saw Appellant, who matched the description of the suspect.

Officer Shields testified as follows:

> [The Commonwealth]: Can you tell His Honor, when you
> approached [Appellant], as His Honor saw on the video, what did
> you say to him?
>
> [Officer Shields]: I said, "Sir, can we talk to you?" He moved his
> hand, so I grabbed his hand.  I didn't -- because we're going to a
> guy with multiple guns, I tried grabbing his hand because his hand
> was moving towards his pants.
>
>        \*     \*     \*
>
> [The Commonwealth]: Okay.  And when you put your hand on
> [Appellant] as this video shows, why did you do that?
>
> [Officer Shields]: I was afraid he might have a -- might be going
> for a gun.
>
> [The Commonwealth]: And what made you think that that might
> be a possibility?

_____

[3] At the hearing, the Commonwealth produced a copy of the email to SEPTA police, which bore the subject line "Man w/a gun" and included a photograph with the following text: "this male just left a pawn shop at 5200 Frankford Ave attempting to sell 3 guns and into the FTC (10-15 minutes ago).  Please use caution!"  *See* N.T. Suppression Hr'g at 13; Commonwealth's Ex. 2.

[4] The record reflects that all of the information concerning Appellant's activity at the pawn shop was conveyed to Officer Shields through the radio call and through the email from police.  *See* N.T. Suppression Hr'g at 9-12; 19-20.

[Officer Shields]: It's a -- we have a lot of shootings around that area and because of the nature of the radio call.

THE COURT: And what exactly was the radio call?

[Officer Shields]: That there's a male trying to sell guns in a shop that's not -- that doesn't deal guns.

[The Commonwealth]: And what about -- did that radio call raise your suspicions?

[Officer Shields]: Yes.

[The Commonwealth]: Why?

[Officer Shields]: Well, it -- like I said, the pawnshop doesn't deal in guns and it sounded really strange. I never heard of anybody selling guns and there was quite a few shootings within two or three blocks of the station.

*Id.* at 17.

The Commonwealth also played the surveillance footage from the FTC. *See* Commonwealth's Ex. 3. The start of the video reflects a timestamp of April 21, 2018 at 11:09:56 a.m. At approximately 11:11:53 a.m., Appellant walks into the frame as he moves toward the escalators. Moments later, at 11:11:57 a.m., Appellant sees a male acquaintance coming from the escalator area. Appellant and the other man exchange greetings and begin a conversation. While the two men are talking, at 11:12:12 a.m., Officer Shields enters the frame as he rides down the escalator behind a crowd of people. At that time, Appellant has his back to the escalator area. At 11:12:16 a.m., just as Officer Shields steps off the escalator, Appellant and the other man hug goodbye, and Appellant begins to turn towards the escalator area. As Appellant is turning his body towards the left, at 11:12:17

- 4 -

a.m., Appellant sees Officer Shields coming toward him. Appellant stops turning and remains motionless as Officer Shields approaches him at 11:12:19 a.m., at which point Officer Shields immediately grabs Appellant's right wrist. At 11:12:20 a.m., the video shows Officer Shields pulling Appellant's right arm up by his jacket sleeve, turning Appellant's body, and leading Appellant out of the frame with both of his hands placed on Appellant.

At the conclusion of the hearing, the trial court denied Appellant's motion to suppress.[5] *Id.* at 36. The matter immediately proceeded to a stipulated bench trial at which the trial court found Appellant guilty of the aforementioned charges. *Id.* at 41-43.

On November 7, 2019, the trial court sentenced Appellant to an aggregate term of two to four years' incarceration followed by five years' probation. Appellant filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement.

The trial court issued a Rule 1925(a) opinion addressing Appellant's claim. Specifically, the trial court concluded there was reasonable suspicion to detain Appellant because "police were aware that Appellant attempted to sell guns in an establishment that was legally prohibited to buy them" and "Appellant then made a furtive gesture toward his waistband and attempted to flee even though all the police did was approach him and ask him if he

---

[5] The parties entered a stipulation that none of the firearms had obliterated serial numbers. The trial court did not place its findings of fact and conclusions of law on the record.

would agree to speak to them." Trial Ct. Op., 12/11/19, at 8. Additionally, the trial court noted that the FTC was a high crime area. *Id.*

On appeal, Appellant raises the following issue:

Did not the trial court err in denying Appellant's motion to suppress physical evidence under the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution where the arresting officers lacked reasonable suspicion to believe that Appellant was engaged in criminal conduct where he was physically stopped and subjected to an arrest [or] investigatory detention merely based upon the receipt of information over police radio that he had attempted to sell three guns in his possession at a pawn shop, all in contradiction to the recent holding of the Pennsylvania Supreme Court in *Commonwealth v. Hicks*, 208 A.3d 917, 937 (Pa. 2019)?

Appellant's Brief at 3.

Appellant argues that the "the situation in the instant case is indistinguishable" from *Hicks*. *Id.* at 16. Appellant asserts that, like the officer in *Hicks*, Officer Shields seized Appellant based solely on evidence that he was in possession of a firearm. *Id.* Appellant contends that "[t]he additional fact that he had openly offered to sell the guns to a legitimate business, but was informed that they were not licensed to engage in such a transaction, does not provide any basis for reasonable suspicion to believe that he was engaged in criminal activity." *Id.* at 11. Further, Appellant argues that the surveillance footage "demonstrates the absence of any furtive movement, and that [Appellant] was physically taken into custody and led away by the arresting officers before there was any attempt to flee." *Id.*

(emphasis omitted).  Therefore, Appellant concludes that the trial court erred in denying his motion to suppress.

The Commonwealth responds that "[c]ontrary to [Appellant's] assertions, the police had reasonable suspicion to believe [that Appellant] had committed a weapons offense at the time they approached him." Commonwealth's Brief at 9.  Specifically, the Commonwealth contends that, unlike the defendant in *Hicks*, Appellant "attempted to sell three guns to an unlicensed store and one gun appeared to have an obliterated serial number." *Id.* at 17.  Based on that information, the Commonwealth argues that "a stop and frisk would have been permitted even in the absence of a reaching motion." *Id.* at 20.  In any event, the Commonwealth asserts that Appellant's "furtive movement gave officers reasonable suspicion to frisk him[.]" *Id.* at 11.  Therefore, the Commonwealth concludes that Appellant is not entitled to relief.

"Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010).

It is well settled that "Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures.  Jurisprudence arising under both charters has led to the development of three categories of interactions

between citizens and police." ***Commonwealth v. Lyles***, 97 A.3d 298, 302 (Pa. 2014) (citations omitted).

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Pakacki***, 901 A.2d 983, 987 (Pa. 2006) (citations omitted); ***see also Hicks*** 208 A.3d at 927 (explaining that an investigative detention is also known as a "'***Terry*** stop,' or, when coupled with a brief pat-down search for weapons on the suspect's person, a 'stop and frisk.'").

"In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. We are bound by the suppression court's factual findings, if supported by the record[.]" ***Lyles***, 97 A.3d at 302 (citations omitted). However, this Court has held that a video recording made part of the certified record may, in rare cases, contradict a trial court's factual findings that are based on credibility determinations. ***See Commonwealth v. Griffin***, 116 A.3d 1139, 1143 (Pa. Super. 2015) (reversing the trial court's order denying a motion to suppress where the trial court's factual finding that drugs recovered from the defendant's pocket were "immediately apparent" during frisk was contradicted by a dash cam video that "clearly depict[ed] the officer repeatedly manipulating [the defendant's] pocket").

The issue of whether "a seizure occurred [] is a pure question of law subject to plenary review." *Lyles*, 97 A.3d at 302 (citation omitted).

> No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

*Commonwealth v. Adams*, 205 A.3d 1195, 1200 (Pa. 2019) (citations and some formatting omitted).

> [T]o establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. The question of whether reasonable suspicion existed at the time [an officer conducts the stop] must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a particularized and objective basis for suspecting the individual stopped. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of the [stop] warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Green*, 168 A.3d 180, 184 (Pa. Super. 2017) (citation omitted).

This Court has explained:

[T]he relevant inquiry is whether an officer possesses reasonable suspicion of criminal activity before initiating the detention. While experience teaches that the reality of these encounters often does not yield sharp constitutional lines, the prescribed constitutional analysis demands that at the moment an encounter moves from a consensual "mere encounter" to an investigative detention, police must already have the requisite reasonable suspicion to support that detention—reasonable suspicion cannot be based on information discovered after the detention has begun.

*Commonwealth v. Mackey*, 177 A.3d 221, 232 (Pa. Super. 2017) (emphasis omitted).

In *Hicks*, our Supreme Court overruled this Court's decision in *Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. 1991), which established a *per se* rule that "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Hicks*, 208 A.3d at 947 (quoting *Robinson*, 600 A.2d at 959).

In place of *Robinson*'s *per se* rule, *Hicks* held that

[u]nless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

*Hicks*, 208 A.3d at 937.

Further, the *Hicks* Court explained:

A police officer is trained to assess people and situations for danger. An officer responding to a dispatch . . . is capable of

- 10 -

responding in a manner not amounting to a seizure by observing the suspect and the circumstances, by determining whether anyone appears to be in danger or whether a crime appears to be occurring, and by interviewing witnesses about any crimes that may have occurred before the officer's arrival. *See* [*Commonwealth v. Jackson*, 698 A.2d 571, 575 (Pa. 1997)] (reasoning that, where the available information does not give rise to reasonable suspicion, "the police must investigate further by means not constituting a search and seizure."). Such activities preserve peace, law, and order, and do so without depriving anyone of his freedom unless there is cause to do so.

*Id.*; *see also Commonwealth v. Price*, 225 A.3d 1118 (Pa. Super. 2019) (applying *Hicks* and concluding that the police officer did not have reasonable suspicion for a seizure based solely on information that the defendant was in possession of a firearm).

Here, the trial court credited Officer Shields' testimony that Appellant made a furtive movement by reaching towards his waistband and that Appellant fled from police unprovoked. *See* Trial Ct. Op. at 8. However, the video evidence clearly contradicts these findings. As discussed previously, the surveillance footage demonstrates that Appellant remained still as Officer Shields approached, at which point Officer Shields grabbed Appellant's right hand and led him out of the frame with both of his hands on Appellant. *See* Commonwealth's Ex. 3. Therefore, to the extent the trial court considered Appellant's "furtive movements" in finding that Officer Shields had reasonable suspicion, we are not bound by that conclusion. *See Griffin*, 116 A.3d at 1143 (rejecting the trial court's credibility determination where "[t]he video clearly rebut[ted]" the officer's statement).

The video footage also demonstrates that Officer Shields seized Appellant **before** Appellant made any attempt to flee. **See** N.T. Suppression Hr'g at 17; Commonwealth's Ex. 3; **see also** Trial Ct. Op. at 3. We reiterate that, when evaluating whether there was reasonable suspicion to justify a seizure, "the relevant 'totality' of circumstances does not include events that occurred after the seizure was effectuated." **Mackey**, 177 A.3d at 229 (emphasis omitted). Therefore, Appellant's subsequent flight does not affect our analysis of whether Officer Shields had reasonable suspicion to justify the initial seizure. **See id.**; **see also Griffin**, 116 A.3d at 1143. Accordingly, to the extent the trial court considered Appellant's subsequent flight in its analysis of reasonable suspicion, this was error.

The certified record establishes that, at the time of the seizure, the articulable facts were that (1) Appellant was allegedly in possession of three firearms; (2) Appellant allegedly tried to sell those firearms at a nearby pawn shop, which Officer Shields found "strange," given that the pawn shop was not licensed to sell firearms; and (3) Officer Shields' assessment that the neighborhood surrounding the FTC was a high crime area.[6] **See** N.T. Suppression Hr'g at 17.

---

[6] In concluding that Officer Shields had reasonable suspicion to stop Appellant, the dissent considers an additional factor, stating that "[t]he pawn shop also told police that one of [Appellant's] firearms may have had an obliterated serial number[,] which is illegal." **See** Dissenting Mem. at 4. However, our review of the record confirms that this information was **not** known to Officer Shields at the time of the initial seizure. Therefore, the possibility that Appellant was in possession of a gun with an obliterated serial number does

*(Footnote Continued Next Page)*

Based on the totality of these circumstances, we conclude that Officer Shields did not have reasonable suspicion to seize Appellant. **See Green**, 168 A.3d at 184. We emphasize that, beyond his assessment that Appellant's attempted sale at the pawn shop was "strange," Officer Shields did not explain why Appellant's behavior was indicative of criminal activity.[7] **See Hicks**, 208

---

not affect our totality-of-circumstances analysis of whether Officer Shields had reasonable suspicion to seize Appellant.

As noted previously, Officer Shields testified at the suppression hearing that he learned of Appellant's activity at the pawn shop through two sources: (1) the radio call and (2) the email from police. Although Officer Shields initially stated that the pawn shop "said one of [the firearms] might have had an obliterated serial number or something," **see** N.T. Suppression Hr'g at 9-10, he later clarified, on two separate lines of questioning, that this detail was not included in the flash information he originally received from police. **See id.** at 17 (stating, in response to the trial court, that the radio call said "[t]hat there's a male trying to sell guns in a shop that's not -- that doesn't deal guns"); **see also id.** at 18 (confirming on cross-examination that the only information included in the radio call was that there was a man inside of the pawn shop attempting to sell guns). Likewise, no information about corrosion or an obliterated serial number appeared in the email sent by police. **See** Commonwealth's Ex. 1 (email entitled "Man w/a gun," which included a photograph with the following text: "this male just left a pawn shop at 5200 Frankford Ave attempting to sell 3 guns and into the FTC (10-15 minutes ago). Please use caution!").

Moreover, we note that there is no mention of corrosion or an obliterated serial number on the property receipt for Appellant's firearms. **See** Commonwealth's Ex. 4. Instead, that information appears for the first time on the Firearms Identification Unit lab report, which was filed almost two weeks after Appellant's arrest. **See** Commonwealth's Ex. 5 (reflecting that there was surface corrosion on one of the firearms).

[7] In concluding that Officer Shields had reasonable suspicion, the dissent observes:

*(Footnote Continued Next Page)*

- 13 -

A.3d at 937; **see also Jackson**, 698 A.2d at 575 (stating that where the available information does not give rise to reasonable suspicion, "the police must investigate further by means not constituting a search and seizure"). Therefore, the trial court erred in denying Appellant's suppression motion.

In sum, because we conclude that Officer Shields did not have reasonable suspicion to conduct the initial seizure, the trial court erred in denying Appellant's motion to suppress on that basis. Accordingly, we reverse the trial court's suppression order, vacate Appellant's judgment of sentence, and remand for further proceedings.

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

President Judge Panella joins the memorandum.

Judge Pellegrini files a dissenting memorandum.

---

18 Pa.C.S. § 6111(g)(1) provides that "Any person who is not a licensed importer, manufacturer or dealer and who desires to sell or transfer a firearm to another unlicensed person shall do so only upon the place of business of a licensed importer, manufacturer, dealer, or county sheriff's office, the latter of whom shall follow the procedure set forth in this section as if he were the seller of the firearm. Officer Shields was aware that 555 Gold Pawn Shop was not a licensed firearms' dealer that could purchase guns.

**See** Dissenting Mem. at 4.

However, aside from Officer Shields' testimony that Appellant's attempted sale of the guns at the pawn shop was "strange," the Commonwealth presented no evidence that Officer Shields had a reasonable belief that Appellant had or was about to engage in a violation of Section 6111 or that any other criminal activity was afoot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/9/2021