J-A02033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIARA JACQUATA MIA DANIELS | : | |
| | : | |
| Appellant | : | No. 659 WDA 2023 |

Appeal from the Judgment of Sentence Entered May 8, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0004164-2022

BEFORE: KUNSELMAN, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.: **FILED: May 6, 2025**

Kiara Jacquata Mia Daniels ("Daniels") appeals from the judgment of sentence entered by the Allegheny County Court of Common Pleas ("trial court") after the trial court convicted her of two counts of driving under the influence ("DUI")—general impairment and highest rate of alcohol[1]—following a stipulated bench trial. Daniels challenges the trial court's denial of her motion to suppress evidence, claiming that the police illegally detained her while she sat in her parked vehicle without the requisite reasonable suspicion that she was engaged in criminal activity. She further contends that police did not have probable cause to arrest her for DUI and that police conducted an illegal search of her vehicle without a warrant. Because we conclude that

---

[1] 75 Pa.C.S. § 3802(a)(1), (c).

the police conducted an investigative detention of Daniels without the requisite reasonable suspicion, we reverse the order denying Daniels' motion to suppress and vacate Daniels' judgment of sentence.

**Facts and Procedural History**

The record reflects that the following evidence was introduced at the March 9, 2023 hearing on Daniels' motion to suppress. On April 11, 2022, shortly after midnight, City of Pittsburgh Police Officer Patrick Fornadel received a call from dispatch reporting that someone "in the area" called 911 to report "a suspected DUI on Ledlie Street" in the city's Hill District neighborhood. N.T., 3/9/2023, at 5, 14; *see also id.* at 9 (responding affirmatively to query on cross examination asking if the 911 "call was for a possible intoxicated driver, for erratic driving"). Officer Fornadel "recognized the name" of the 911 caller based upon "prior knowledge." *Id.* at 12.[2] The dispatcher told Officer Fornadel to be on the lookout for a white Chevy Cruze four-door sedan with "possible side damage," a female driver, and an "unsecured juvenile in the car." *Id.* at 5. Officer Fornadel was not provided

---

[2] Officer Fornadel did not elaborate upon the nature of his "prior knowledge," except vaguely referencing another part of the call. *Id.* at 12. He also did not reveal the name of the caller at the suppression hearing or document the caller's name in his police report. *Id.* at 13. Officer Fornadel told Daniels at the scene that he did not know who called because he did not want to "inflame" or "incite the situation" and he "did not have to give her that information." *Id.* at 12.

any other description of the female driver—such as her race, age, weight, or attire—or the juvenile. *Id.* at 11-12.

Officer Fornadel spotted a white Chevy Cruze on Cliff Street, which is perpendicular to Ledlie Street. *Id.* at 5, 9-11. After activating the emergency lights on his two-person vehicle,[3] Officer Fornadel approached the Chevy Cruze on foot from the front. *Id.* at 10, 13. According to Officer Fornadel, the car matched the description "with a female and an unsecured juvenile in the car." *Id.* at 6.[4] Officer Fornadel recognized that the vehicle was a Chevy Cruze from the front without seeing the emblem based upon his familiarity with this common make and model. *Id.* at 11.

Officer Fornadel did not describe the car's position or condition on direct examination. In response to questions on cross-examination, Officer Fornadel confirmed that he did not observe anyone driving the car and that it "appear[ed] to be" parked when he arrived. *Id.* at 11. On redirect examination, Officer Fornadel asserted that the car was "sitting lodged – the vehicle was in the light post" and that he observed it "already" had sustained

_____

[3] As we discuss in more detail infra, it is not clear from the suppression record whether a second officer was present at the inception of the encounter.

[4] The suppression record does not reveal how and when Officer Fornadel observed the female driver or the "unsecured" juvenile passenger. Likewise, it is silent as to the juvenile's age, location in the vehicle, relationship to Daniels, and the extent of any apparent safety risks to the juvenile. The juvenile was not mentioned again at the suppression hearing and police did not charge Daniels with any crimes pertaining to the juvenile.

damage to its front when he approached the car. *Id.* at 20. After the Commonwealth asked Officer Fornadel to clarify when he first saw the damage, Officer Fornadel acknowledged that he did not see the front-end damage upon his approach and only saw it "afterwards." *Id.* at 20. He did not elaborate regarding the nature of the damage. On recross examination, Officer Fornadel asserted that the "vehicle was physically touching the pole." *Id.* at 22. However, after viewing the footage from his body-worn camera during cross-examination, Officer Fornadel retreated from his initial testimony concerning the position of the car, stating that he could not "judge it either way" from the video and could not definitively say that the vehicle was touching the pole. *Id.* at 22-23.

The first thing that Officer Fornadel noticed when he "[e]ngaged the driver," who he later determined to be Daniels, was her "slurred speech" and "bloodshot glassy eyes." *Id.* at 6. Officer Fornadel had never met Daniels before and was unfamiliar with her normal speech pattern. *Id.* at 14. Although bloodshot eyes could also occur from tiredness, allergies, or rubbing, Officer Fornadel did not ask Daniels about any of these alternatives. *Id.* To the officer, these signs were "[p]retty much textbook indicators" of a suspected DUI. *Id.* at 6-7. During his direct examination, Officer Fornadel never mentioned smelling alcohol at any point during the encounter. When asked by the prosecutor during redirect examination if he smelled alcohol when he first approached the vehicle, he responded, "I don't recall." *Id.* at

20. When asked if anything about Daniels' demeanor made the officer suspect that she was intoxicated, Officer Fornadel responded that Daniels appeared to be "very apprehensive" and "standoffish" when answering questions. *Id.* at 20. When asked if there was anything else that he noticed in the vehicle that led him to believe that Daniels was impaired, Officer Fornadel responded that there was a bottle of "clear liquor" that he believed was rum that was "sitting within reach of the driver." *Id.* at 7. Later in his testimony, however, Officer Fornadel acknowledged that he did not recall whether the rum was in plain view of the officers. *Id.* at 21.

Officer Fornadel asked Daniels to step out of the vehicle. *Id.* at 7, 15. She complied. *Id.* Officer Fornadel noted that once she was out of her vehicle, Daniels was "unsteady on her feet," with a "gait [that] was kind of obscure," which indicated to Officer Fornadel that Daniels was under the influence. *Id.* at 7.[5] Nevertheless, Daniels was able to walk around to the back of the car on her own. *Id.* at 15. Officer Fornadel did not recall Daniels swaying on her feet or fumbling when she produced her identification. *Id.* Officer Fornadel asked Daniels to undergo a field sobriety test but she declined. *Id.* at 7-8. Based upon his suspicion that she was intoxicated, her refusal to undergo field

---

[5] Officer Fornadel did not elaborate upon what he meant by a "kind of obscure" gait. *Id.*

testing, and the "street being a hill,"[6] "everything added up" and Officer Fornadel "detained" Daniels "for suspected DUI" by placing her in handcuffs. *Id.*

While Daniels was handcuffed, another officer (who was unnamed at the suppression hearing) entered Daniels' vehicle and retrieved the bottle of suspected liquor. *Id.* at 17. Officer Fornadel had "no idea" if any officer asked Daniels to consent to a search of her vehicle, but he "personally did not." *Id.* at 18. The video did not record Daniels providing consent to a search and the police did not obtain a warrant before entering her vehicle. *Id.* at 18-19. Officer Fornadel transported Daniels to the Zone 6 police station for testing. *Id.* at 7-8, 19.

Officer Fornadel was the only witness at the hearing. Neither party sought to admit any exhibits, including the body-worn camera footage shown to Officer Fornadel during cross-examination. At the conclusion of the hearing, the trial court heard oral argument and permitted the parties to brief their arguments. Following the submission of briefs, the parties proceeded to a stipulated bench trial on April 18, 2023. At the outset of the trial, the trial court informed the parties that it had entered an order denying the

---

[6] Officer Fornadel did not explain why the street being a hill contributed to his suspicion that Daniels had driven while intoxicated.

suppression motion. N.T., 4/18/2023, at 2.[7] In lieu of trial testimony, the

parties stipulated to the entry of the affidavit of probable cause, the transcript

from the suppression hearing, and Commonwealth Exhibits 1-4, which

_____

[7] Daniels' counsel requested that the trial court place its findings of fact and conclusions of law from the suppression motion on the record before the bench trial proceeded. *Id.* at 2. The trial court declined, stating that it was not prepared to do so, that it could do so at the end of the trial, and if counsel required the findings in advance that it would need to continue the trial to accommodate the request. *Id.* at 3. Defense counsel agreed to proceed but requested the findings at the conclusion of trial. *Id.* at 4. The trial court told defense counsel to make the request in writing. *Id.* Defense counsel complied. *See generally* Motion for Findings of Fact and Conclusions of Law in Accordance with Pa.R.Crim.P. 581(I), 4/19/2023. The trial court did not issue its findings of fact and conclusions of law until after Daniels filed a notice of appeal. *See generally* Trial Court Opinion, 2/21/2024.

This procedure was incorrect. A trial court has a duty to explain its factual findings and conclusions of law on the record at the conclusion of the suppression hearing. Pa.R.Crim.P. 581(I) ("At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights, or in violation of these rules or any statute[.]"). Although in this case the trial court's failure to abide by Rule 581 has not impeded our appellate review, as the trial court subsequently explained its rationale in its Pa.R.A.P. 1925(a) opinion, both our Supreme Court and this Court have strongly disapproved of trial court's failure to abide by Rule 581's "unambiguous mandate." *See In re L.J.*, 79 A.3d 1073, 1086 (Pa. 2013) ("[D]efendants simply should not be forced to guess, or to learn for the first time in a post-sentence opinion, what evidence supported the trial court's suppression ruling."); *Commonwealth v. Millner*, 888 A.2d 680, 688 (Pa. 2005) (explaining the purpose of the rule); *Commonwealth v. Grundza*, 819 A.2d 66, 68 n.1 (Pa. Super. 2003) ("We note that the filing of a 1925(a) opinion is no substitute for the failure to make findings of fact and conclusions of law on the record at the conclusion of a suppression hearing in accordance with Pa.R.Crim.P. 581(I).").

included the body camera video footage.[8]  ***Id.*** at 4-5.  The trial court found

Daniels guilty of two counts of DUI.  ***Id.*** at 7.  On May 8, 2023, the trial court

sentenced Daniels to 90 to 180 days at Allegheny County Jail, with permission

to participate in probation with electronic home monitoring, with a concurrent

sentence of 18 months of probation.  ***Id.*** at 7.

Daniels timely appealed to this Court.  Both the trial court and Daniels

have complied with Pennsylvania Rule of Appellate Procedure 1925.  Daniels

presents the following issues for review:

> I. Whether the trial court erred in denying Daniels' motion to suppress where her interaction with the police officers was an investigative detention from the inception, not a mere encounter, but the officers lacked reasonable suspicion, based on specific and articulable facts, to believe that she was engaged in criminal activity?

> II. Whether the trial court erred in denying Daniels' motion to suppress where the police arrested Daniels for DUI, but they lacked probable cause to support such determination?

> III. Whether the trial court erred in denying Daniels' motion to suppress where, following her arrest, the police searched the interior of her vehicle and found a bottle of alcohol, but such search was conducted without a warrant and the plain-view doctrine did not apply?

Daniels' Brief at 6 (personal titles and suggested answers omitted).

**Scope and Standard of Review / Trial Court Decision**

---

[8]  None of these trial exhibits appear in the certified record submitted to this Court on appeal.

When reviewing the denial of a suppression motion, we bear in mind that "the trial court's findings of fact are binding upon us to the extent they have record support," but we review its legal conclusions de novo. ***Commonwealth v. Adams***, 205 A.3d 1195, 1199 (Pa. 2019). "Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." ***Commonwealth v. Smith***, 164 A.3d 1255, 1257 (Pa. Super. 2017). "Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial." ***Commonwealth v. Rivera***, 311 A.3d 1160, 1164 (Pa. Super. 2024).

Once a defendant files a motion to suppress evidence, the Commonwealth bears the "burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." ***Commonwealth v. Wallace***, 42 A.3d 1040, 1047-48 (Pa. 2012); ***see also*** Pa.R.Crim.P. 581(H) ("The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights").

In its Rule 1925 opinion, the trial court determined that the interaction began as a mere encounter because Officer Fornadel "merely approached" Daniels' already-parked car to engage the driver and had not directed the car to stop. Trial Court Opinion, 2/21/2024, at 3 ("Since the vehicle was already

stopped, the vehicle was not stopped for search and seizure purposes."). The encounter did not turn coercive, the trial court decided, until Officer Fornadel ordered Daniels to step out of the car, and by then, Daniels' "slurred speech, and glossy bloodshot eyes, combined with the nearby bottle of what appeared to be liquor[,] provided reasonable suspicion for Officer Fornadel to conduct an investigative detention." *Id.* at 3-4.

Likewise, the trial court reasoned, these same indicators, plus Daniels' "unsteady gait," refusal to perform field sobriety tests, and "running" vehicle engine were sufficient to establish probable cause to arrest Daniels. *Id.* at 4-5. Finally, regarding the bottle of alcohol, the trial court determined that bottle was "in plain view near the driver's seat and was seen by Officer Fornadel and the officer [who] seized it from the vehicle." *Id.* at 5.

Before we address the merits of Daniels' issues, we clarify a preliminary matter concerning the state of the evidentiary record and the scope of our review. The facts of this case are not complex, yet both parties have unnecessarily complicated our review by referring to facts that are not part of the certified suppression record on appeal.

Daniels cites facts that she says appear in video footage from Officer Fornadel's body-worn camera, such as the number of officers on the scene, the officers' position around her car, and their use of flashlights during the encounter. *See* Daniels' Brief at 31-32. Defense counsel used portions of the footage during cross- and recross examination of Officer Fornadel but did not

move to enter the video into evidence. Cognizant of this, Daniels argues that we should nevertheless consider the video on appellate review because the prosecutor did not object to its use during cross-examination and both parties referred to the video during their closing arguments. *See id.* at 8 n.1 (citing *Commonwealth v. Jones*, 271 A.3d 452, 457 (Pa. Super. 2021)).

This we cannot do. Our consideration of the video is precluded by an en banc decision of this Court which limits the application of *Jones*, *Commonwealth v. Snowden*, 330 A.2d 422 (Pa. Super. 2025) (en banc).

By way of background, *Jones* was a direct appeal challenging the sufficiency of the evidence to prove third-degree murder in a bench trial. During its case-in-chief, the Commonwealth sought to play surveillance video footage depicting the bar fight that ended in the victim's death. *Jones*, 271 A.3d at 456. Defense counsel stipulated that the video was authentic and relevant, the trial court directed the prosecution to play the video without objection, and both parties and the trial court treated the video as if it was part of the record even though the prosecutor neglected to move the video into evidence formally. *Id.* at 456-57. On appeal, the defendant claimed, for the first time, that the video was not part of the record. *Id.* As a matter of first impression, we rejected the defendant's claim under the circumstances presented in the case. *Id.*

In *Snowden*, this Court declined to apply the reasoning of *Jones* to a defendant's use of a video for impeachment or clarification purposes during

cross-examination. *Snowden*, 330 A.2d at 429. Like the instant case, Snowden's counsel showed an officer his body camera footage during cross-examination, and after viewing the footage, the officer changed or clarified his prior testimony. *Id.* at 430-31. Like Daniels, and unlike in *Jones*, the parties did not stipulate to the authenticity or admissibility of the video, and the defendant "clearly, and successfully, utilized the instant video solely" to impeach an officer's testimony as opposed to both parties using the video "to characterize the events it depicted." *See id.* Without moving "for admission of the unmarked video, the Commonwealth was deprived of the opportunity to object to its admission or to request that it be limited to the purpose for which it was plainly used – impeachment." *Id.* at 431.

Here, the parties stipulated to the entry of the video as a trial exhibit only; no party sought to enter it as an exhibit at the suppression hearing. *See Rivera*, 311 A.3d at 1164. Daniels used the video at the suppression hearing solely to impeach or clarify portions of Officer Fornadel's testimony. *See* N.T., 3/9/2025, 11-12, 16-17, 22-23 (using the video to impeach Officer Fornadel's testimony regarding the direction from which he approached Daniels' car and the positioning of Daniels' car vis a vis the light pole); *see also id.* at 12, 16-17 (using the video to clarify what Officer Fornadel told Daniels regarding the identity of the 911 caller, whether Daniels refused to undergo a blood testing, and the point in the encounter in which another officer retrieved the liquor bottle from her car). Accordingly, in accordance with *Snowden*, the video is

not within our scope of review. *See id.* Thus, we limit our assessment of the merits to the suppression record, which includes the testimony of Officer Fornadel elicited on cross-examination that constitutes "evidence for the defense uncontradicted when read in context of the record as a whole." *See Smith*, 164 A.3d at 1257.

The Commonwealth likewise cites facts that are not part of the suppression record. *Compare* Commonwealth's Brief at 10 (asserting that Officer Fornadel "noticed the smell of alcohol" when Daniels stepped out of the car) *with* N.T., 3/4/2023, at 20 (Officer Fornadel testifying that he did not recall if he smelled alcohol).[9] While the Commonwealth may have derived certain facts from Officer Fornadel's affidavit of probable cause, to which the parties stipulated was evidence for purposes of the bench trial, the affidavit of probable cause was not made part of the suppression record and thus cannot

_____

[9] In its proposed findings of fact and conclusions of law submitted to the trial court, the Commonwealth also made multiple factual assertions to which Officer Fornadel did not testify at the suppression hearing: Daniels "was seated in the driver's seat, seat belted, and the engine was running"; "[o]fficers … noticed the smell of alcohol emanating from [Daniels'] person" prior to requesting that she exit the vehicle; and "[w]hile speaking with [Daniels] officers observed an open bottle of Bacardi Limon in the passenger seat next to where [Daniels] was seated." Commonwealth's Brief in Opposition to Defendant's Motion to Suppress, 4/6/2023, at 1-2 (numbering supplied. The Commonwealth also peppered its argument before the trial court with additional facts that do not appear in the suppression record. *See id.* at 2 (identifying the 911 caller as Brian Bennette and claiming that he "subsequently appeared on the scene"); *id.* at 6 (referring to an officer named "Officer Brian Bigley" who "noted the bottle of alcohol sitting in the passenger seat next to where [Daniels] was seated in the driver's seat").

be considered in our review of the suppression decision. **See Riviera**, 311 A.3d at 1164.

**Legality of the Initial Police Encounter**

Having clarified the scope of the record before us, we turn now to Daniels' arguments. Her first issue requires this Court to determine whether the trial court erred in determining the point of seizure and concluding that the Commonwealth met its burden to demonstrate that its police officers had the requisite level of suspicion. **See** Daniels' Brief at 27-48. Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect people from unreasonable searches and seizures. **Commonwealth v. Lyles**, 97 A.3d 298 (Pa. 2014). "To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." **Commonwealth v. Sanchez**, 326 A.3d 926, 933 (Pa. Super. 2024).

<u>Level of Interaction</u>

There are three levels of interaction between police officers and citizens, each with a different level of justification required to initiate the interaction. **Commonwealth v. Hicks**, 208 A.3d 916, 927 (Pa. 2019).

> The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop

- 14 -

or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way. The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.

*Adams*, 205 A.3d at 1199-1200. Thus, so long as the requisite predicate level of suspicion is present, law enforcement officers may lawfully engage in a warrantless seizure of the person in two instances: an investigative detention, which is also known as a *Terry*[10] stop, and a custodial detention. *Hicks*, 208 A.3d at 927. If the seizure is not justified by the requisite level of suspicion, however, the seizure "immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule." *Id.* at 927-28.

"In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances." *Lyles*, 97 A.3d

---

[10] First recognized in the seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968), an investigative detention is a practical crime investigation and prevention tool that balances the "constitutionally protected privacy interests of the individual" with "the needs and safety of law enforcement personnel." *Hicks*, 208 A.3d at 921. "Our Supreme Court has held that 'the Fourth Amendment of the United States Constitution] and Article I, Section 8 of the Pennsylvania Constitution are coterminous for *Terry* … purposes." *Commonwealth v. Mackey*, 177 A.3d 221, 227 (Pa. Super. 2017) (quoting *Commonwealth v. Chase*, 960 A.2d 108, 118 (Pa. 2008)) (cleaned up).

at 302. A seizure occurs when a police officer restrains the liberty of a citizen through physical force or show of authority. **Adams**, 205 A.3d at 1199. When ascertaining whether police have elevated the interaction from a mere encounter to a seizure, courts must determine "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" **Id.** at 1200 (quoting **Florida v. Bostick**, 501 U.S. 429, 437 (1991)). In other words, the court must ascertain whether a reasonable person would feel free to leave or whether the totality of the circumstances indicate that the police officers restrained the suspect by physical force or a show of coercive authority. **Lyles**, 97 A.3d at 350. "Determining [the] point [of detention] with precision is crucial to the constitutional analysis because the police must have reasonable suspicion at the moment of detention; information developed **after** a police-citizen encounter moves from consensual to coercive cannot be used to justify the detention." **Commonwealth v. Mackey**, 177 A.3d at 228 (emphasis in original).

Daniels argues that despite the trial court's proclamation that it relied upon the totality of the circumstances, its analysis narrowly focused upon the parked car and did not discuss factors that depict a more coercive situation from the inception of the encounter. **Id.** at 31-32. First, while the trial court's findings and analysis mention only Officer Fornadel's approach of the car,

Daniels contends that Officer Fornadel's testimony (and video footage of his body-worn camera) indicate that a second officer was present during the initial interaction. *Id.* at 31-32. Second, Daniels emphasizes that two uniformed police officers activated the lights of their police cruiser, flanked both sides of Daniels' car, shined their flashlights into her car, and directed Daniels to lower the window. *Id.* at 31-35. Based upon the totality of the circumstances, Daniels insists that any reasonable person would not have felt free to leave or disregard the officers. *Id.* at 31-32. We agree with Daniels that by narrowly focusing its analysis upon the already-stopped nature of the vehicle, the trial court failed to consider the totality of the circumstances that may have made a reasonable person feel as if she were not free to leave or disregard police directives. *See Commonwealth v. Mathis*, 173 A.3d 699, 712 (Pa. 2017) (noting that one "single factor" cannot dictate "the ultimate conclusion of whether a detention occurred"). The crux of the matter is whether the police seized Daniels' person for constitutional purposes as she sat inside her parked car, not whether police caused her to bring her car to a physical stop. The trial court's analysis failed to consider the use of emergency lights and the directive to roll down the window,[11] which our High Court has plainly held

---

[11] While Daniels is correct that the presence of a second officer may contribute to the coerciveness of the encounter, *see Commonwealth v. Powell*, 228 A.3d 1, 2 (Pa. Super. 2020), the record does not clearly indicate whether a second officer was present at the outset and whether a second officer accompanied Officer Fornadel when approaching her car. The trial court did
*(Footnote Continued Next Page)*

gives rise to a finding that the encounter was an investigative detention. ***See***

***Commonwealth v. Livingstone,*** 174 A.3d 609, 625 (Pa. 2017) (holding that

a reasonable person sitting alongside a highway in a stationary car would not

feel free to leave after a police officer pulled a patrol car with emergency lights

activated alongside the vehicle). Moreover, despite arguing at the hearing

that the interaction began as a mere encounter, the Commonwealth concedes

on appeal that the interaction was an investigative detention from the outset.

Commonwealth's Brief at 8. Based on the foregoing, we agree that the trial

court erred by concluding that the officer's initial approach was a mere

encounter. ***See Livingstone***, 174 A.3d at 625.

Reasonable Suspicion

We next address whether the Commonwealth established the requisite

level of suspicion at time of the investigative detention. The trial court

_____

not make an explicit finding regarding the number of officers who approached Daniels' car. Instead, in recounting the event, the trial court only refers to Officer Fornadel and mentions the second officer in passing when referring to that officer's retrieval of the liquor bottle from Daniels' car. ***See*** Trial Court Opinion, 2/9/2024, at 2. The suppression record before us is murky regarding the number of officers present and the time of their arrival. Upon review of the "evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole," ***see Smith***, 164 A.3d at 1257, Officer Fornadel's direct testimony implies only that a second unnamed officer **may** have been present from the outset. ***See*** N.T. 3/9/2023, at 10 ("I was riding a two[-]man car."). After being shown his body-worn camera footage on cross examination, Officer Fornadel conceded that a second officer retrieved the bottle of liquor from Daniels' car after she was handcuffed in the backseat of his police cruiser and that there were "numerous officers on scene." ***See id.*** at 16-18. The record, however, does not specify when the other officers arrived.

determined that even if the encounter was an investigative detention from its inception, the 911 caller's tip that "there was a suspected drunk female driver of a white Chevy Cruze on Ledlie Street" provided Officer Fornadel with reasonable suspicion to seize Daniels at the outset. Trial Court Opinion, 2/9/2024, at 4. The caller identified himself to police, which the trial court found made "the source of the tip … a known informant" that allowed police to assume the tip was trustworthy and reliable. *Id.*

Daniels maintains that Officer Fornadel lacked reasonable suspicion to conduct a *Terry* stop because the sole generator of his suspicion was the 911 caller's general allegation that she may have been driving under the influence. *Id.* The trial court's analysis, Daniels contends, rests upon the legally erroneous premise that the caller was a "known informant." Daniels' Brief at 39-40. While Officer Fornadel was aware of the caller's identity, Daniels argues that the reliability of the 911 caller was tantamount to that of an anonymous source because the Commonwealth did not name the caller in the suppression record, explain why the caller was trustworthy, or assert why it could not or should not name the caller. *Id.* at 40 (citing *Commonwealth v. Torres*, 764 A.2d 532, 537 n.3 (Pa. 2001) (determining that the trial court properly treated tipsters who were known to the police but unnamed in an affidavit of probable cause as anonymous sources)). Furthermore, Daniels argues, the anonymous tip had no "specific predictive basis as to the described individual's activities that would not have been known to anyone in the public

at large." *Id.* at 46. Daniels emphasizes that the officer seized her after observing her "simply sitting in [a] lawfully parked vehicle" of common make and model in the general vicinity of the caller's report and without independently observing any indicators that Daniels had been involved in past, present, or future criminal activity. *Id.* at 47.

To detain a person for investigative purposes, a police officer needs to identify "specific and articulable facts that led the officer to believe that criminal activity was afoot, considered in light of the officer's training and experience." *Adams*, 205 A.3d at 1205 (citation and quotation marks omitted). The facts need to be "premised upon specific and articulable facts particular to the detained individual." *Hicks*, 208 A.3d at 938. Courts need to assess totality of the circumstances, and "afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention." *Commonwealth v. Brown*, 996 A.2d 473, 477 (Pa. 2010).

Reasonable suspicion for a stop and frisk may be based upon information supplied by another person independent of the officer's personal observation. *Adams v. Williams*, 407 U.S. 143, 147 (1972). Tips "vary greatly in their value and reliability," and some tips are reliable and specific enough to enable police to detain a citizen without more. *Id.* Others require independent police corroboration. *See id.* Providing an "accurate description

of a subject's readily observable location and appearance" is helpful to "correctly identify the person whom the tipster means to accuse," but fails to "show that the tipster has knowledge of concealed criminal activity." ***Florida v. J.L.***, 529 U.S. 266, 272 (2000).  Thus, to support reasonable suspicion without an officer's independent corroboration, the tip needs to be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." ***Id.***

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.  Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," ***United States v. Cortez***, 449 U.S. 411, 417 (1981), that must be taken into account when evaluating whether there is reasonable suspicion.  Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

***Alabama v. White***, 496 U.S. 325, 330-31 (1990).

In general, the law is more skeptical of anonymous tips than tips provided by informers known to police or members of the public who do not conceal their identities.  ***See Mackey***, 177 A.3d at 230.  A tip by a known individual is presumed more reliable because the individual makes herself subject to prosecution for filing a false claim, whereas an anonymous tip may be a "prank call" or "based on no more than the caller's unparticularized hunch." ***Commonwealth v. Jackson***, 698 A.2d 571, 574 (Pa. 1997).  Furthermore, unknown individuals often fail to "reveal the basis for their alleged knowledge and are generally unavailable to answer follow-up

questions from police." ***Mackey***, 177 A.3d at 230. A tipster's "reliability, veracity, and basis of knowledge are all relevant factors" in assessing the totality of the circumstances. ***Commonwealth v. Allen***, 725 A.2d 737, 740 (Pa. 1999).

Corroboration of certain details of an anonymous tip through independent police work may permit the officer to rely upon the tip based upon the premise that because the caller is right about some things, the caller may be right about others. ***See White***, 496 U.S. at 332 (holding that under totality of circumstances, anonymous caller's tip predicting future behavior "demonstrated inside information" and "special familiarity with [White's] affairs," as corroborated by police, was reliable enough to presume that caller was correct about other allegations); ***Jackson***, 698 A.2d at 573–75 (holding that "a ***Terry*** stop may be made on the basis of an anonymous tip, provided the tip is sufficiently corroborated by independent police work to give rise to a reasonable belief that the tip was correct").

There are no "specific details that must be listed like a recipe" to prove at a suppression hearing that a third-party source was reliable. ***See Commonwealth v. Brown***, 996 A.2d 473, 478 (Pa. 2010) (declining to deem a source anonymous or to require the officer to describe more than that he had "previously used" a publicly confidential but internally known informant in the past; it is logical that an experienced police officer would not rely upon an informant for a tip who has been unreliable in the past). Furthermore, even

anonymous tips may have "adequate indicia of reliability" that permit an officer to proceed from the premise that the tip was correct, particularly in scenarios where an officer may pursue charges against the tipster if the report turned out to be false. *See Naverette v. California*, 572 U.S. 393, 369 n.1, 398–401 (2014) (assuming anonymity of a 911 caller arguendo but nevertheless presuming reliability of tip because caller used 911 emergency system, which has features for identifying and tracing callers that protect against false reports, and caller made near contemporaneous specific accusation that a vehicle with a particular license plate had run the caller off the road); *see also Brown*, 996 A.2d at 478 (declining to equate a confidential but known informant with an anonymous informant because "providing false information will have consequences for a known informant such as this one," which distinguishes "the presumptive quality of the information, and tipping the scales toward credibility, not away from it").

The "totality of the circumstances standard remains the governing standard for the reasonable suspicion analysis and demands an objective consideration of all factors attending a tip provided by a police informant—anonymous or not." *Navarette*, 572 U.S. at 396. "Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Id.* (quoting *Terry*, 392 U.S. at 30).

In the instant case, Officer Fornadel testified that a "different part of [the 911] call stemmed from the fact that I recognized the name attached to

the call" and that he did not have to provide Daniels with that information "[b]ecause of the situation and we were – I have prior knowledge of who the caller was … and I didn't feel at that time it was necessary to incite the situation or inflame it." N.T., 3/9/2023, at 12. At the suppression hearing, far removed from the heated initial situation, Officer Fornadel still did not name the caller or explain why he could not do so. Strictly speaking, the fact that the caller could be tracked down by the police lends some reliability to the tip compared to a completely anonymous source. *See Navarette*, 572 U.S. at 400-01; *Brown*, 996 A.2d at 478.

Yet at the hearing, Officer Fornadel never described—even in broad terms—whether or how the way in which he was familiar with the caller lent credibility to the caller's information. *Cf. Brown*, 996 A.2d at 478; *accord Torres*, 764 A.2d at 537 n.3 (determining that tipsters who were known to police but unnamed in an affidavit of probable cause were anonymous for whether Commonwealth had probable cause to obtain a search warrant). Simply recognizing the name of the caller does not inherently make the tip more reliable because the Commonwealth did not establish **any** information concerning the nature of Officer Fornadel's prior knowledge of the caller or the relative relationship between the caller and Daniels that seemingly existed. *Cf. Commonwealth v. Kondash*, 808 A.2d 943, 947 (Pa. Super. 2002) (explaining that five heroin users provided specific information concerning an alleged heroin dealer's activities).

Without even a general description of the caller's basis of knowledge, the rather vague accusation of possible drunk driving or erratic driving did not infuse Officer Fornadel with reasonable suspicion just based upon the tip itself. *Compare Allen*, 725 A.2d at 737 (holding that police officer lacked reasonable suspicion to stop person sleeping in a chair outside of a specified address who matched general description of someone nicknamed "Mookie," despite secondhand tip that Mookie was selling drugs out of that house; officer did not know specific basis of knowledge of the tipster's source), *and Commonwealth v. Jones*, 845 A.2d 821, 825 (Pa. Super. 2004) (holding that information provided by an individual complaining "that a vehicle matching the description of Jones' vehicle and license plate number was involved in 'drug activity'" was insufficiently specific to justify Jones' detention), *with Navarette*, 572 U.S. at 399 (providing detailed information regarding allegation of wrongdoing, suggesting that caller was an eyewitness to the alleged crime by a specific vehicle identified by license plate), *and Commonwealth v. Lohr*, 715 A.2d 459, 460 (Pa. Super. 1998) (holding that reasonable suspicion to stop Lohr derived from a call from a citizen who personally watched Lohr "erratically drive his red and white Ford Bronco into the parking lot and enter the store, seemingly intoxicated" before following Lohr into the store and smelling "alcohol coming from his general direction"). The suppression record does not reveal **how** the caller knew Daniels was intoxicated, let alone driving under the influence, or how recently Daniels had

been alleged to doing so. The suppression record does not even indicate whether the caller identified Daniels as the one who was driving or simply reported a female driver (as Officer Fornadel's testimony suggests).

Furthermore, Officer Fornadel's own observations did not sufficiently corroborate the tip. At the time Officer Fornadel activated his lights, approached the car, and directed Daniels to lower her window, the record does not contain any specific and articulable facts demonstrating that Officer Fornadel suspected that Daniels had committed or was about to commit a crime beyond the caller's mere allegation that she had driven under the influence. According to the suppression record, Officer Fornadel located a parked car matching the color, make, and model (which, as Officer Fornadel recognized, was a very common make and model, enabling him to identify the vehicle without observing the emblem) in the vicinity of Ledlie Street with a woman in the driver's seat and an unsecured juvenile—a description that could range from a toddler unsecured in a car seat to a seventeen year old without a seatbelt fastened.[12]

The car did not have "possible side damage," as reported by the caller, and Officer Fornadel did not see the damage to the front of the vehicle at the time he approached the car. Critical details about the position and condition

---

[12] The car was parked when Officer Fornadel approached, so simply seeing an unsecured juvenile would not be indicative of criminal activity.

of the car are noticeably absent from the suppression record.[13]   Nor is the record clear regarding any relationship between the car and a light post. Despite the Commonwealth's arguments that Daniels' Chevy Cruze was "resting against a light pole," Commonwealth's Brief at 2, 8, and that it "had collided with a light pole," *id.* at 4, 9, the evidence in the suppression record does not stretch far enough to permit the inference that Daniels struck the light pole, let alone that she did so because she was intoxicated.   The trial court did not make any factual findings concerning the relationship of the parked car to a light pole, including whether there had been a collision.   Except for providing the car's general location on Ledlie Street, the Commonwealth provided no information at the suppression hearing regarding the condition and positioning of the car.   *See id.* at 4-9.   While one statement from Officer Fornadel's redirect testimony hints at a collision—that the vehicle was "sitting lodged" or "in the light post," *id.* at 20—he clarified on recross-examination that he could not definitively say that the vehicle was even touching the light pole, *see id.* at 22-23.   Simply put, police did not have reasonable suspicion to subject Daniels to an investigative detention.

---

[13]  Although the trial court found that the vehicle was "parked with the engine running" on Cliff Street near where it intersects with Ledlie Street, Trial Court Opinion, 2/21/2024, at 2, this lacks support in the suppression record.   There are no details concerning the engine or even Daniels' position in the car beyond being in the driver's seat.   The trial court's suppression ruling must be based upon its "findings of fact and conclusions of law as expressed at the time of the suppression hearing," not from trial.   *L.J.*, 79 A.3d at 1086.

**Conclusion**

The Commonwealth bears the burden of establishing reasonable suspicion at the suppression hearing. It failed to do so here. Without reasonable suspicion, the initial police interaction with Daniels was unconstitutional. The Commonwealth simply failed to establish that a general tip accusing a female driver of "suspected DUI," without any indication of the caller's basis of knowledge, carried the weight that it needed to in the absence of the officer's corroboration of the allegation. Accordingly, we conclude that the trial court erred by determining that Officer Fornadel possessed reasonable suspicion to stop Daniels at the time he turned his emergency lights on and approached her vehicle with the direction to roll down her window.[14] Accordingly, we reverse the denial of the motion to suppress and vacate Daniels' judgment of sentence.

Order denying motion to suppress reversed. Judgement of sentence vacated.

---

[14] Because we conclude that Officer Fornadel did not have reasonable suspicion to stop Daniels, we need not address her arguments that the Commonwealth lacked probable cause to arrest her and that they conducted an illegal search of her vehicle.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/6/2025