J-S22009-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENGE NMN LEWIS JR. | : | |
| | : | |
| Appellant | : | No. 1272 MDA 2024 |

Appeal from the Judgment of Sentence Entered August 1, 2024
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000167-2023

BEFORE:   LAZARUS, P.J., BOWES, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: NOVEMBER 20, 2025**

Kenge Nmn Lewis, Jr. appeals from the judgment of sentence of four to eight years in prison imposed upon his convictions for two firearms-related offenses.  We affirm.

We glean the following factual background from the certified record.  On December 1, 2022, at approximately 11:00 p.m., two officers of the York City Police Department initiated a traffic stop near Farquhar Park.  The suspect in the vehicle fled from law enforcement on foot.   A description was provided by the officers present at the traffic stop and communicated over the police radio, which included the approximate height of a black male wearing a black hoodie and gray sweatpants.

_____

Former Justice specially assigned to the Superior Court.

Thirty minutes later, Officer Giovanni McBride was parked in his police cruiser three-quarters of a mile from where the suspect had escaped. The officer observed Appellant wearing a fanny pack walking east on a one-way street, away from the scene. He believed Appellant matched the physical description of the absconder. Before Officer McBride could confirm the report that had previously been broadcast, he pursued Appellant. Since the officer had to drive against traffic on a one-way street, he activated his emergency lights for safety. As he approached, Appellant ceased walking, raised his hands above his head, and took off his fanny pack to place it in the grass beside the sidewalk.

The officer radioed that he was stopping Appellant, who was wearing all gray, and informed him that he matched the physical characteristics of the individual who fled from a traffic stop. Upon contact, Appellant was cooperative with the officer, but exceedingly nervous. Once Officer McBride asked Appellant to provide identification, he retrieved his photo-ID from the fanny pack on the ground. Appellant eventually admitted to Officer McBride that the bag contained a firearm, which he was prohibited from carrying due to his felony conviction for possession with intent to deliver a controlled substance ("PWID"). Subsequently, Appellant was arrested and charged with carrying a firearm without a license and persons not to possess pursuant to 18 Pa.C.S. § 6105, based upon his previous PWID conviction.

Prior to trial, Appellant filed an omnibus motion. Therein, he first requested dismissal of his § 6105 charge, asserting that the law was unconstitutional as applied to him because the conviction that triggered the prohibition, PWID, was a non-violent offense. **See** Omnibus Pretrial Motion, 6/20/23, at ¶ 1. Appellant further sought to suppress the firearm located inside his fanny pack, arguing that Officer McBride lacked the requisite suspicion to stop him because he relied upon a general description, and Appellant's clothing did not match that of the suspect. **Id**. at ¶ 46.

The trial court entered an order denying Appellant's motion to dismiss his § 6105 conviction, incorporating a then-recent opinion from the Court of Common Pleas of York County, sitting *en banc*, wherein it denied other motions to dismiss filed by multiple similarly-situated defendants. **See** Order and Opinion, 10/31/23. The court thereafter held a hearing on Appellant's suppression request. Officer McBride and Appellant testified to the aforementioned facts, and the officer confirmed that the reason he stopped Appellant was to detain him until other officers could verify his identification. The court also reviewed the bodycam and dashcam footage. Ultimately, the court denied the motion to suppress the firearm.

The matter proceeded to a stipulated bench trial. At its conclusion, the court convicted Appellant of both firearms offenses and later imposed the above-referenced sentence. Appellant timely appealed, and both he and the

trial court complied with the requirements of Pa.R.A.P. 1925. He now presents

the following questions for our consideration:

> [1.] Did the [trial] court err in denying [Appellant's] suppression motion where an officer seized him by activating the lights on his police cruiser and pulling up to him after driving the wrong way while lacking reasonable suspicion for a seizure because he had only a generic description of a suspect who had fled a traffic stop "quite a distance" away and half an hour earlier?
>
> [2.] In the alternative, did the [trial] court err in refusing to dismiss [Appellant's] charge under 18 Pa.C.S. § 6105 for violating the United States Constitution as applied to him where the statute regulates conduct protected by the Second Amendment and the Commonwealth failed to establish that this restriction is consistent with this Nation's history of firearm regulation?

Appellant's brief at 4.

We begin with Appellant's suppression challenge. The following

precepts guide our analysis:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [Where] the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa.Super. 2017) (cleaned up).

Additionally, the Fourth Amendment protects citizens from unreasonable searches and seizures. *See Commonwealth v. Ewida*, 333 A.3d 1269, 1275 (Pa.Super. 2025). Our caselaw categorizes the following three types of warrantless interactions between citizens and police officers that must be justified by varying degrees of suspicion:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Sanchez*, 326 A.3d 926, 933 (Pa.Super. 2024) (cleaned up).

With respect to determining when an investigative detention occurs, "a person is considered seized only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Commonwealth v. Livingstone*, 174 A.3d 609, 619 (Pa. 2017) (cleaned up). The critical inquiry "is whether the officer, by means of physical force or a show of authority, has restrained a citizen's freedom of movement." *Commonwealth v. Wilson*, 237 A.3d 572, 577 (Pa.Super. 2020) (cleaned up). For example, our High Court has held that in the context of a traffic stop, a citizen is detained when an officer has activated the

emergency lights on a patrol car because a reasonable person would not feel free to leave in that circumstance.  *See Livingstone*, 174 A.3d at 625.

To justify an investigative detention, an officer must provide "specific and articulable facts that led the officer to believe that criminal activity was afoot, considered in light of the officer's training and experience." *Commonwealth v. Adams*, 205 A.3d 1195, 1205 (Pa. 2019) (cleaned up). Our Supreme Court has explained:

> [T]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, . . . it may be the essence of good police work to adopt an intermediate response.  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Commonwealth v. Jackson*, 302 A.3d 737, 748 (Pa. 2023) (cleaned up).

When analyzing whether a police officer acted reasonably in stopping a suspect, "[w]e must consider the totality of the circumstances, including such factors as tips, the reliability of the informants, time, location, and suspicious activity."  *Commonwealth v. Mackey*, 177 A.3d 221, 229 (Pa.Super. 2017) (cleaned up).  Importantly, "[i]t is not the function of a reviewing court to analyze whether each individual circumstance gave rise to reasonable suspicion, but rather to base that determination upon the . . . the whole picture."  *In re D.M.*, 727 A.2d 556, 559 (Pa. 1999) (cleaned up).

As to the trustworthiness of supplied information, "while an officer is prohibited from relying on an unparticularized suspicion or a hunch as a basis for [an investigative detention], he or she may rely on a police radio broadcast if the suspect matches the specific description given by the individual who reported the crime." *Commonwealth v. Thran*, 185 A.3d 1041, 1046 (Pa.Super. 2018) (cleaned up). Contrarily, "[t]he veracity and reliability of anonymous tips are particularly difficult for the police to evaluate," and thus "when the underlying source of the police department's information is an anonymous telephone call, the tip should be treated with particular suspicion." *Mackey*, 177 A.3d at 230 (cleaned up). Therefore, "[i]f information has a low degree of reliability," such as a report from an unidentified source, "then more information is required to establish reasonable suspicion." *Commonwealth v. Morrison*, 166 A.3d 357, 365 (Pa.Super. 2017) (cleaned up).

In its Rule 1925(a) opinion, the court provided its reasoning for denying Appellant's suppression motion as follows:

> [I]t is clear that this was essentially an investigative detention. [The court] note[d] from the video on the bridge at the time the encounter began, [Appellant wa]s walking from the area of Farquhar Park, and he appear[ed] to be wearing, given the light on the bridge, a dark top and gray pants. Even in the encounter, he appear[ed] to be wearing gray. The officers were on their way to determine whether or not this was the individual who had fled from the scene earlier.
>
> In looking at the circumstances at the time that [Appellant] was stopped, there certainly was information available to engage appropriately in an investigative detention. It [wa]s also clear that there was a [fanny ]pack on the ground in the video, and when asked for his ID, [Appellant] went back and picked up the

- 7 -

[fanny ]pack from the ground and obtained his ID. As soon as he picked it up, the officer asked if there was anything in there that was illegal, and [Appellant] admitted there was a gun.

Trial Court Opinion, 10/31/24, at 8 (quoting N.T. Suppression, 1/10/24, at 61-63).

Appellant argues that Officer McBride subjected him to an investigative detention at the moment the officer approached him in his patrol vehicle with the emergency lights illuminated. **See** Appellant's brief at 16 (citing **Livingstone**, 174 A.3d at 619). He contends that the seizure was illegal where the purpose of the detention was to allow "other officers [to] come and determine whether he was the suspect who fled the traffic stop." **Id**. at 19. Although Officer McBride was aware of the suspect's height, race, gender, and clothing, and that he had fled thirty minutes earlier, Appellant maintains that the officer did not have sufficient information to apprehend him because he was located "quite a distance on foot" away from the scene, was not detained in close temporal proximity to the traffic stop, and his clothing was not identical to the description. **Id**. at 21, 24-26 (citing **In re D.M.** and **Morrison**).

We agree with Appellant that he was subject to an investigative detention when Officer McBride activated his emergency lights in pursuit of him. **See Livingstone**, 174 A.3d at 625; **see also Thran**, 185 A.3d at 1045 (citing **Livingstone** for the proposition that "when the police activate the overhead emergency lights, no reasonable person would believe he or she was

free to leave[,]" and holding that when the officer approached the appellant, who was standing next to his motorcycle, with his emergency lights flashing, he was subject to an investigative detention). Indeed, upon observing Officer McBride approach, Appellant immediately stopped walking and raised both hands above his head. In this circumstance, a reasonable person would not feel free to leave. Accordingly, Officer McBride had to provide "specific and articulable facts" to justify the stop. *See Adams*, 205 A.3d at 1205.

Considering the factual findings of the trial court, which are supported by the record, we conclude that the officer had the requisite suspicion to detain Appellant. Specifically, Appellant matched the description provided by a known source listing the absconder's height, race, gender, and clothing.[1] He was also located three-quarters of a mile from the scene, spotted one-half hour after the crime, and was the only individual in the area. In accordance with our precedent, the whole of these factors provided Officer McBride with sufficient information to justify a brief detention.

---

[1] While the police radio broadcast stated that the suspect was wearing a black hoodie with gray sweatpants, and Officer McBride indicated that Appellant was wearing all gray, this is a distinction without a difference. The video and testimonial evidence bore out that Appellant was wearing a dark-colored hoodie and light-gray sweatpants. Considering that Officer McBride conducted this stop at 11:30 p.m., it is not surprising that he believed that Appellant's top was dark gray. *See* N.T. Suppression Hearing, 1/10/24, at 33 (Trial court stating that it was "unimpressed by a distinction between black and gray at 11:30 at night.").

For example, with respect to tips and the reliability of informants, in *Commonwealth v. Jackson*, 519 A.2d 427 (Pa.Super. 1986), this Court held that an officer acted reasonably in stopping an individual who matched a vague description provided by a named eyewitness. The report stated that the absconder was a black male wearing a gray sweatsuit running east down the street. *Id*. at 428. The officer stopped Jackson as he was running west, but the Court determined that the detention was justified because Jackson matched the description supplied by a known source, and he was near the scene shortly after the crime. *Id*. at 432.

This case is akin to *Jackson* insofar as Officer McBride relied upon a tip from a fellow officer. Although the report in *Jackson* was lacking in detail, and the suspect was stopped running toward the scene of the crime, the Court nevertheless concluded that the officer acted reasonably because the description was provided by an identified individual, which was inherently legitimate, and Jackson matched it. Likewise, Officer McBride was not acting on "an unparticularized suspicion or a hunch" in detaining Appellant where he fit a greater detailed description that originated from a trusted source. *See Thran*, 185 A.3d at 1046.

Contrastingly, in *Morrison* this Court determined that an officer did not act reasonably in relying on an anonymous tip to apprehend a black male who was wearing a black hoodie and gray sweatpants. A call from an unknown source stated that the assailants were two black males wearing black hoodies,

blue jeans, and masks, and "[n]o further physical description of the suspects was provided." *Morrison*, 166 A.3d at 366-67. Since the anonymous report was too general to be reliable, and the appellant did not precisely match the description, the Court concluded that the officer was not justified in his stop. *Id*. at 366.

The matter herein is distinguishable from *Morrison*. Officer McBride did not rely on an anonymous tip. Rather, he was provided with an eyewitness report and therefore did not need to treat the information with particularized suspicion. Also, unlike in *Morrison*, Appellant matched the description stated in the dispatch. The dashcam and bodycam footage, which the trial court and this Court reviewed, confirmed that Appellant was wearing a dark-colored hoodie and gray sweatpants. Although the exact color of Appellant's top was difficult to decipher at that time of night, it was a dark color, and Appellant attested that he was wearing "money green," *see* N.T. Suppression Hearing, 1/10/24, at 57, a shade that substantially fit the report. *Id*. at 33 (Trial court noting that in the video "it look[ed] like [Appellant's] top [wa]s black."). Plainly, Officer McBride received a police radio broadcast that matched Appellant's description, and he properly relied upon that information to detain him. *See Thran*, 185 A.3d at 1046 (stating that an officer "may rely on a police radio broadcast if the suspect matches the specific description given by the individual who reported the crime").

Concerning the factors of temporal and physical proximity to the scene of a crime, *In re D.M.* is instructive. There, our High Court concluded that an officer was justified in stopping D.M. because he and his companions were detained one minute after the crime and less than one block from the scene. *Id*. at 560. They also matched the number of suspects, fit the general physical descriptions, and were the only individuals in the vicinity. *Id*. Notably, in discussing the time and location of the stop, the Court distinguished *Commonwealth v. Berrios*, 263 A.2d 342 (Pa. 1970). In *Berrios*, three suspects had fled the scene of a crime. Twenty minutes later, officers stopped two men only three blocks away. The *In re D.M.* Court noted that the officers in *Berrios* did not act reasonably because the appellants' location was "inconsistent with 'flight' since the suspects could have traveled much further in over twenty minutes if they had been trying to flee a crime." *In re D.M.*, 727 A.2d at 560. Unlike in *Berrios*, the *In re D.M.* Court explained, D.M. was apprehended close to the scene and one minute after the report. *Id*. The Court also noted that he was detained for merely a few minutes, and "would have been free to leave following the victim's identification had he not possessed an illegal firearm." *Id*.

Here, unlike the suspects in *Berrios*, Appellant's locale was consistent with flight. He was apprehended three-quarters of a mile away from the scene, walking in the opposite direction, and within thirty minutes of the police report. There were also no other individuals near Appellant, and the stop

- 12 -

occurred late in the evening. Additionally, the dashcam and bodycam footage revealed that Appellant was only held for a short period where other officers arrived to confirm his identity one minute after Officer McBride stopped him. Like the suspect in *In re D.M.*, Appellant would have been free to leave following his identification had he not possessed an illegal firearm.

Accordingly, based on the totality of the circumstances, Officer McBride reasonably suspected that Appellant was the absconder. Therefore, the officer's brief detainment of Appellant was justified to verify his identity and "maintain the status quo momentarily while obtaining more information . . . in light of the facts known to the officer at the time." *Jackson*, 302 A.3d at 748. Hence, this argument lacks merit.[2]

---

[2] The learned dissent concludes that Officer McBride did not possess enough information to reasonably suspect that crime was afoot and that Appellant was the suspect involved, in part, because the police broadcast did not indicate the color of Appellant's shoes. *See* Dissenting Memorandum at 2, 6. The latter point implicates Officer McBride's offhanded comment that since he observed Appellant wearing white shoes, if the report had stated that the suspect was wearing red shoes, he would not have stopped Appellant. *See* N.T. Suppression Hearing, 1/10/24, at 39. To be clear, there is no suggestion that the suspect wore red shoes. Accordingly, we fail to see how this hypothetical observation concerning the suspect's shoe color is relevant to our analysis.

To reiterate, Officer McBride knew of the suspect's height, race, gender, and clothing, which Appellant matched. The two officers that provided this description were at the scene of the traffic stop and reported that the absconder had fled on foot. *See* 75 Pa.C.S. § 3733 (Fleeing or attempting to elude a police officer). Officer McBride thus received an inherently reliable description, was aware that a crime had been committed or was in progress, and reasonably believed Appellant was the culprit. As outlined in the body of

*(Footnote Continued Next Page)*

Appellant's final contention concerns the constitutionality of § 6105. This issue presents a question of law, for which our standard of review "is *de novo*, and our scope of review is plenary." ***Commonwealth v. Leschinskie***, 329 A.3d 459, 464 (Pa.Super. 2024) (cleaned up). We are also tasked with considering an as-applied challenge, which "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." ***Commonwealth v. McCabe***, 265 A.3d 1279, 1290 (Pa. 2021) (cleaned up).

Appellant argues that § 6105 is unconstitutional as applied to him because it deprives him of his Second Amendment rights when his underlying

_____

this memorandum, that was sufficient information to affect a stop pursuant to ***Terry v. Ohio***, 392 U.S. 1 (1968).

We also find unpersuasive the dissent's reliance on ***Berrios***, ***Commonwealth v. Hicks***, 253 A.2d 276 (Pa. 1969), and ***In re D.M.*** for the proposition that the information that Officer McBride possessed "f[e]ll woefully short of the specificity required to justify a stop." Dissenting Memorandum at 3. The first two cases are easily distinguished: (1) in ***Berrios***, the officers possessed a less detailed report than Officer McBride; and (2) unlike Appellant, Hicks did not match the provided description. Additionally, as opposed to the officers in ***Berrios***, Officer McBride stopped Appellant three-quarters of a mile away from the scene and one-half hour later. The fact that the traffic stop occurred northwest of where Appellant was spotted does not render his locale inconsistent with flight considering the suspect's direction was unknown once the pursuit was terminated, and Officer McBride stopped Appellant a distance away from the scene in light of the one-half hour interval. ***See*** N.T. Suppression Hearing, 1/10/24, at 27 (Officer McBride stating that he "wouldn't go directly to the traffic stop because obviously the individual would be far from there"). Lastly, in ***In re D.M.***, the officers refrained from merely relying upon a description of a black male, and as explained *supra*, possessed additional facts that justified the stop, like Officer McBride. Hence, that case supports our disposition.

offense, PWID, is a non-violent crime and "there is no tradition of disarming those convicted of non[-]violent felonies." **See** Appellant's brief at 31. He claims that the Commonwealth fell short of its burden to prove that § 6105 is consistent with the Nation's tradition of firearm regulation, as required by the test outlined in **New York State Rifle & Pistol Association v. Bruen**, 597 U.S. 1 (2022), where it failed to provide a historical analogue "for categorically disallowing those convicted of nonviolent felonies from possessing firearms." **Id**. at 35-36.

This Court recently addressed this precise issue in **Commonwealth v. Randolph**, ___ A.3d ___, 2025 WL 2166516 (Pa.Super. 2025), and denied relief. Randolph challenged the constitutionality of § 6105 based upon two prior convictions for PWID, asserting that the drug offense is not one of violence. We summarized the pertinent caselaw implicated by this claim, including the recent United States Supreme Court cases of **Bruen** and **United States v. Rahimi**, 602 U.S. 680 (2024). In **Bruen**, the Court articulated the following two-part test controlling Second Amendment constitutional challenges:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

**Id**. at 24 (citation omitted).

- 15 -

Subsequently, in **Rahimi**, the Supreme Court clarified and reinforced the **Bruen** test as follows:

> A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances. Discerning and developing the law in this way is a commonplace task for any lawyer or judge.
>
> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

**Rahimi**, 602 U.S. at 692 (cleaned up).

In **Randolph**, this Court interpreted and applied the tests outlined above. We determined that the plain text of the Second Amendment covered the firearm prohibition in question, and despite Randolph's felony convictions, he was one of "the people" protected by the Second Amendment. **See Randolph**, 2025 WL 2166516, at *7. However, we concluded that Randolph's argument was meritless with respect to the second prong, concerning the requirement that the Commonwealth justify § 6105 by demonstrating its compatibility with the Nation's historical tradition of firearms regulation. We explained, *inter alia*, that our country has a history of disarming classes of

people, including "individual[s] found by a court to pose a credible threat to the physical safety of another." *Id*. at *9 (citing *Rahimi*, 602 U.S. at 702). We further determined that "[d]rug traffickers fit that mold." *Id*. at *10. Thus, Randolph's as-applied constitutional challenge failed where the prohibition outlined in § 6105 was supported by historical analogues.

Here, Appellant presents an identical argument as in *Randolph*. Consequently, his as-applied challenge fails because this Court has determined that individuals convicted of PWID pose a credible threat to others and may be constitutionally disarmed. *See Randolph*, 2025 WL 2166516, at *9-10. Hence, no relief is due.

In sum, Officer McBride had sufficient reasonable suspicion to stop Appellant, and based upon our decision in *Randolph*, Appellant's constitutional challenge to § 6105 also lacks merit. Accordingly, we affirm his judgment of sentence.

Judgment of sentence affirmed.

P.J.E. Stevens joins this Memorandum.

P.J. Lazarus files a Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/20/2025